PAUL A. GREISMAN, D.O., PLAINTIFF-RESPONDENT, v. THE NEWCOMB HOSPITAL, ETC., *ET AL.*, DEFEND-ANTS-APPELLANTS.

Argued May 20, 1963—Decided July 1, 1963.

*Mr. Nicholas Conover English* argued the cause for appellants (*Messrs. McCarter & English,* by *Mr. Woodruff J. English,* of counsel; *Messrs. Adamo and Pagliughi,* attorneys for defendants-appellants, The Newcomb Hospital and Board of Trustees of The Newcomb Hospital; *Messrs. Shapiro, Brotman & Eisenstat,* attorneys for defendant-appellant, Medical Staff of The Newcomb Hospital).

*Mr. Marvin D. Perskie* argued the cause for respondent (*Messrs. Perskie & Perskie,* attorneys).

The opinion of the court was delivered by

JACOBS, J. The Law Division directed that the defendants consider the plaintiff's application for membership on the courtesy medical staff of the Newcomb Hospital without regard to a requirement in their bylaws which it declared to be void or invalid as to the plaintiff. See *Greisman v. Newcomb Hospital*, 76 *N. J. Super.* 149 (*Law Div.* 1962). The defendants appealed to the Appellate Division and we certified before argument there. *R. R.* 1:10–1(a).

In 1958, the plaintiff graduated from the Philadelphia College of Osteopathy with the degree of doctor of osteopathy. He served an internship, took the full medical boards in New York, and was given an unqualified license to practice medicine and surgery in that state. Thereafter, he was admitted to practice in Michigan, Florida and New Jersey. His New Jersey admission by the State Board of Medical Examiners constituted an unrestricted license to practice medicine and surgery within the borders of our State. See *N. J. S. A.* 45:9–1 *et seq.*; *Falcone v. Middlesex Co. Medical Soc.*, 34 *N. J.* 582 (1961). In July 1959, he began the general practice of medicine in the City of Vineland and, in November 1959, he opened an office in Newfield which is in the Vineland metropolitan area. See 76 *N. J. Super.*, at *p.* 156. Until January 1962 he also engaged in the practice of medicine from his home in Vineland. He is the only licensed physician in Newfield, is the plant physician for a Newfield company engaged in heavy industrial work and for an additional company engaged in the making of glassware, and is the school physician for Newfield's public school as well as for a Catholic school in the same community. He states that he is the only osteopathic physician fully licensed to practice general medicine and surgery in the metropolitan Vineland area which is said to have a population approximating 100,000; the defendants state that there is another osteopathic physician practicing in Vineland but the suggested variance is of no real significance here.

In 1961, the plaintiff sought to file an application for admission to the courtesy staff of the Newcomb Hospital which is located in Vineland about a mile from his home. The hospital was incorporated in 1921, is operated as a general hospital, and is the only hospital in the Vineland metropolitan area. Its certificate of incorporation sets forth the purposes for which it was formed including, first, the care of sick and injured persons residing in Vineland, second, the care of sick and injured persons residing in the vicinity of Vineland, and thereafter the care of such "other sick or injured persons as the facilities of the hospital will permit." The hospital is a nonprofit corporation and its governing body is a Board of Trustees consisting of not less than 15 members. It solicits and receives funds annually in the form of charitable contributions and has received funds from the Ford Foundation. Several years ago it constructed a new building, the cost being borne almost entirely by public subscription. It receives funds from the City of Vineland for the treatment of indigent patients from within the city, and funds from the County of Cumberland for the treatment of indigent patients from other areas in the county. It receives tax exemptions available to nonprofit corporations operated for charitable and like purposes. See *N. J. S. A.* 54:4–3.6; *cf.* 26 *U. S. C. A.* § 501. It is eligible for federal funds under the Hill-Burton Act. 42 *U. S. C. A.* § 291 *et seq.*

Despite suitable requests, the Newcomb Hospital refused to permit the plaintiff to file any application for admission to its courtesy staff. In taking that course it did not question his personal or professional qualifications nor did it purport to exercise a discretion in the process of administrative screening and selection. It rested entirely on a provision in the hospital bylaws which sets forth that an applicant for membership on the courtesy staff must be a graduate of a medical school approved by the American Medical Association and must be a member of the County Medical Society. The American Medical Association has long rejected schools of osteopathy, though the original supporting reasons have been

largely dissipated. See *Falcone v. Middlesex Co. Medical Soc., supra,* 34 *N. J.,* at *p.* 585, *n.* 1; *cf.* "Report of the Committee for the Study of Relations Between Osteopathy and Medicine," 158 *A. M. A. J.* 736 (1955); "Special Report of the Judicial Council," 177 *A. M. A. J.* 774 (1961), 178 *A. M. A. J.* 226 (1961); "Report of the Judicial Council," 184 *A. M. A. J.* 356 (1963). Admittedly, the plaintiff is not a graduate of a medical school approved by the American Medical Association and, because of his schooling, his application to the County Medical Society was never acted upon. The school he graduated from is an accredited school of osteopathy, has been approved as in good standing by the New Jersey State Board of Medical Examiners, and has long given the full traditional medical course as well as osteopathic teaching. See *Falcone v. Middlesex Co. Medical Soc., supra,* 34 *N. J.,* at *pp.* 584–585.

On dates subsequent either to the initiation of the *Falcone* litigation or the decision therein, the following events occurred: The American Hospital Association announced that it would list hospitals having doctors of osteopathy on their staffs. The Joint Commission on Accreditation of Hospitals announced that hospitals listed by the American Hospital Association and having osteopaths on their staffs are eligible for accreditation, providing the overall supervision of clinical work is under "a doctor of medicine (as chief of staff and chief of department, if departmentalized)." See *Joint Commission on Accreditation of Hospitals, Bulletin No.* 25, at *p.* 2 (1960). The Judicial Council of the American Medical Association recommended and its House of Delegates adopted a statement of policy under which members of Medical Societies were authorized to practice with doctors of osteopathy where it was determined locally that they practice on the same scientific principles as those adhered to by the American Medical Association. The Judicial Council of the Medical Society of the State of New Jersey adopted a resolution declaring that it shall not be unethical for members of the Society "to enter into voluntary professional association with

any person holding a full license as a physician or surgeon granted by the State Board of Medical Examiners who adheres to the same scientific principles embraced by the members of the Medical Society of New Jersey." There is nothing in the record to suggest that the plaintiff does not adhere to the scientific principles of the American Medical Association and the New Jersey Medical Society within the contemplation of the afore-mentioned statement of policy and resolution. See 76 *N. J. Super.*, at *p.* 163. Nor does the hospital suggest that its accreditation would be endangered if its courtesy staff included a reputable and qualified osteopathic physician who engaged in the general practice of medicine pursuant to a license to practice general medicine and surgery issued by the State Board of Medical Examiners. Indeed, the Elmer Hospital, which is seven and one-half miles from Newfield, and the Bridgeton Hospital, which is twelve miles from Vineland, have admitted osteopathic physicians to their medical staffs without impairment of their accreditation.

The Law Division found that the Newcomb Hospital did not confine itself to any specialized branch of medicine and had assumed the position and status of the only general hospital open to the public within the convenient accessibility of the inhabitants of the metropolitan area of Vineland, including Newfield; that the plaintiff had suffered economic and other harm because he was not permitted to admit his patients to the hospital or to serve them professionally once they were admitted, or to use the emergency room services of the hospital; that his patients suffered restriction in their choice of physicians or hospital facilities because of the plaintiff's inability to attend them professionally at the hospital, and that this was not minimized by the fact that the plaintiff was permitted to visit them at the hospital without, however, any opportunity to read their charts or prescribe for them. See 76 *N. J. Super.*, at *pp.* 157–159. It concluded that, within the principles expressed in *Falcone, supra,* the provision in the hospital's bylaws which precluded the plaintiff from filing an application for membership was contrary to

the public policy of our State and it directed the hospital to consider the plaintiff's application for membership "in accordance with its remaining valid bylaws." The plaintiff has not attacked any bylaw requirement other than that held void or invalid as to the plaintiff in the Law Division and in his brief he expressly asserts that he does not raise any question as to power of the hospital to exclude an applicant from its staff where its action is taken in good faith and on reasonable grounds and is related "to the advancement of medical science or the elevation of professional standards," citing *Falcone, supra,* 34 *N. J.,* at *p.* 598.

The defendants contend that the Newcomb Hospital is a private rather than a public hospital, that it may in its discretion exclude physicians from its medical staff, and that no legal ground exists for judicial interference with its refusal to consider the plaintiff's application for membership. See *Van Campen v. Olean General Hospital,* 210 *App. Div.* 204, 205 *N. Y. S.* 554 (1924), aff'd, 239 *N. Y.* 615, 147 *N. E.* 219 (1925); *Edson v. Griffin Hospital,* 21 *Conn. Supp.* 55, 144 *A. 2d* 341 (*Conn. Super.* 1958); *Akopiantz v. Board of County Com'rs. of Otero County,* 65 *N. M.* 125, 333 *P. 2d* 611 (1959); Annotation, "Exclusion of or discrimination against physician or surgeon by hospital authorities," 24 *A. L. R. 2d* 850 (1952). They sharply differentiate the precedents involving public (governmental) hospitals where the courts have often exercised their broad judicial authority to insure that exclusionary policies are lawful and are not applied arbitrarily or discriminatorily. See *Jacobs v. Martin,* 20 *N. J. Super.* 531, 540–541 (*Ch. Div.* 1952); *Hamilton County Hospital v. Andrews,* 227 *Ind.* 217, 84 *N. E. 2d* 469 (1949), 85 *N. E. 2d* 365 (1949), *cert.* denied, 338 *U. S.* 831, 70 *S. Ct.* 73, 94 *L. Ed.* 506 (1949); *Ware v. Benedikt,* 225 *Ark.* 185, 280 *S. W. 2d* 234 (1955); *Group Health Cooperative, etc. v. King County Medical Soc.,* 39 *Wash. 2d* 586, 237 *P. 2d* 737 (1952); *Stribling v. Jolley,* 241 *Mo. App.* 1123, 253 *S. W. 2d* 519 (1953). In *Stribling,* the court struck down a rule of the Audrain County Hospital

which sought to exclude all osteopathic doctors as a class (253 *S. W. 2d*, at *p.* 520); in *Group Health Cooperative*, the court held that the exclusion of doctors from a public hospital on the ground that they were practicing contract medicine was "unreasonable, arbitrary, capricious and discriminatory" (237 *P. 2d*, at *p.* 781); and in both *Andrews* and *Ware*, the courts held that public hospital rules which conditioned staff admissions on membership in county medical societies constituted improper delegations, were unreasonable and void (84 *N. E. 2d*, at *p.* 472; 280 *S. W. 2d*, at *p.* 236).

Broad judicial expressions may, of course, be found to the effect that hospitals such as Newcomb are private in nature and that their staff admission policies are entirely discretionary. *But cf. Willis v. Santa Ana Community Hospital Association*, 58 *Cal. 2d* 806, 26 *Cal. Reptr.* 640, 376 *P. 2d* 568 (1962); see also *Joseph v. Passaic Hospital Ass'n*, 26 *N. J.* 557 (1958). They are private in the sense that they are nongovernmental but they are hardly private in other senses. Newcomb is a nonprofit organization dedicated by its certificate of incorporation to the vital public use of serving the sick and injured, its funds are in good measure received from public sources and through public solicitation, and its tax benefits are received because of its nonprofit and non-private aspects. *Cf. Fairmount Hospital, Inc. v. State Board of Tax Appeals*, 122 *N. J. L.* 8, 11 (*Sup. Ct.* 1939), aff'd, 123 *N. J. L.* 201 (*E. & A.* 1939). It constitutes a virtual monopoly in the area in which it functions and it is in no position to claim immunity from public supervision and control because of its allegedly private nature. Indeed, in the development of the law, activities much less public than the hospital activities of Newcomb, have commonly been subjected to judicial (as well as legislative) supervision and control to the extent necessary to satisfy the felt needs of the times. See Douglas, J., concurring in *Lombard v. Louisiana*, 373 *U. S.* 267, 83 *S. Ct.* 1122, 10 *L. Ed. 2d* 338, 343 (1963). See also *Munn v. Illinois*, 94 *U. S.* 113, 24 *L. Ed.* 77 (1877);

*German Alliance Ins. Co. v. Lewis,* 233 *U. S.* 389, 34 *S. Ct.* 612, 58 *L. Ed.* 1011 (1914); *Nebbia v. New York,* 291 *U. S.* 502, 54 *S. Ct.* 505, 78 *L. Ed.* 940 (1934); *Amodio v. Board of Commissioners of W. New York,* 133 *N. J. L.* 220 (*Sup. Ct.* 1945).

During the course of history, judges have often applied the common law so as to regulate private businesses and professions for the common good; perhaps the most notable illustration is the duty of serving all comers on reasonable terms which was imposed by the common law on innkeepers, carriers, farriers and the like. See *Falcone v. Middlesex Co. Medical Soc., supra,* 34 *N. J.,* at *p.* 594; *Garifine v. Monmouth Park Jockey Club,* 29 *N. J.* 47, 50 (1959); *Del., L. & W. R. R. Co. v. Trautwein,* 52 *N. J. L.* 169, 171 (*E. & A.* 1889); *Messenger et al. v. Pennsylvania R. R. Co.,* 36 *N. J. L.* 407 (*Sup. Ct.* 1873), aff'd, 37 *N. J. L.* 531 (*E. & A.* 1874). In the *Messenger* case Chief Justice Beasley, speaking for the former Supreme Court, noted that a railroad, though a private corporation, is engaged in a "public employment," that it "owes a duty to the community" (*cf. A. P. Smith Mfg. Co. v. Barlow,* 13 *N. J.* 145, 154 (1953), appeal dismissed, 346 *U. S.* 861, 98 *L. Ed.* 373 (1953)),[1] and that under considerations of public policy it must be held under obligation to serve

---

[1] In *A. P. Smith,* the court held that under common law principles, and entirely apart from any specific statutory authority, a corporation has the power to make charitable contributions within reasonable limits. It pointed out that early corporate charters indicate that, historically the corporate object was the public one of managing and ordering the trade as well as the private one of profit for the members (see 13 *N. J.,* at *p.* 149; *Cadman, The Corporation in New Jersey* (1949)); and it suggested that, just as conditions prevailing when corporations were originally created required that they serve public as well as private interests, modern conditions require that corporations acknowledge and discharge social as well as private responsibilities as members of the community within which they operate. See Chayes, "The Modern Corporation and the Rule of Law," in *The Corporation in Modern Society* 25 (*Mason ed.* 1959); compare Manne, "The 'Higher Criticism' of the Modern Corporation," 62 *Colum. L. Rev.* 399 (1962) with Berle, "Modern Functions of the Corporate System," 62 *Colum. L. Rev.* 433 (1962).

without discrimination. 36 *N. J. L.*, at *pp.* 410–411. On appeal, Justice Bedle, speaking for the Court of Errors and Appeals, expressed the view that although railroad corporations are private, they hold their property "as a *quasi*-public trust," and that as trustees they must conduct their operations in such manner so as to insure to every member of the community the equal enjoyment of the means of transportation. 37 *N. J. L.*, at *pp.* 536–537. See also *Atwater v. Delaware, L. & W. R. R. Co.*, 48 *N. J. L.* 55, 58 (*Sup. Ct.* 1886); *Olmsted v. Proprietors of Morris Aqueduct*, 47 *N. J. L.* 311, 332 (*E. & A.* 1885).

Implemented by specific legislation, the supervision of private businesses and professions for the public good has gone far beyond the early common law fields. In *Munn v. Illinois, supra,* a state's imposition of maximum charges for the storage of grain in warehouses was sustained in an opinion which stressed that the private property was devoted "to a public use" and was therefore subject to public regulation (94 *U. S.*, at *p.* 130, 24 *L. Ed.*, at *p.* 86); in *German Alliance Ins. Co. v. Lewis, supra,* a state's fixing of fire insurance rates was upheld on the ground that the business of insurance was "so far affected with a public interest" as to justify its regulation (233 *U. S.*, at *p.* 406, 34 *S. Ct.*, at *p.* 617, 58 *L. Ed.*, at *p.* 1020); and in *Nebbia v. New York, supra,* a state's extensive regulation of its milk industry was upheld in an opinion by Justice Roberts which frankly recognized that there is no closed class or category of businesses affected with a public interest, that the phrase means no more than that an industry, for adequate reason, is subject to control for the public good, and that "upon proper occasion and by appropriate measures the state may regulate a business in any of its aspects" (291 *U. S.*, at *pp.* 536–537, 54 *S. Ct.*, at *p.* 516, 78 *L. Ed.*, at *pp.* 956–957). See *Amodio v. Board of Commissioners of W. New York, supra,* 133 *N. J. L.*, at *p.* 224; *cf. State Board of Milk Control v. Newark Milk Co.*, 118 *N. J. Eq.* 504, 516 (*E. & A.* 1935); *Abelson's, Inc. v. N. J. State*

*Board of Optometrists,* 5 *N. J.* 412, 419 (1950); *Fried v. Kervick,* 34 *N. J.* 68, 73 (1961).

Consistent with the historic precedents in the common law and its valued principle of growth (*Collopy v. Newark Eye and Ear Infirmary,* 27 *N. J.* 29, 44 (1958)),[2] and independent of any specific implementing legislation, this court in *Falcone v. Middlesex Co. Medical Soc., supra,* 34 *N. J.* 582, recently exercised its judicial function to strike down an arbitrary membership requirement of a nonprofit organization engaged in activity of public concern. *Cf. Terwilliger v. Graceland Memorial Park Ass'n.,* 35 *N. J.* 259, 265 (1961). There the Middlesex County Medical Society sought to exclude Dr. Falcone from membership because, though fully licensed and otherwise qualified, he could not fulfill its requirement of four years of study at a medical college approved by the American Medical Association—most of his study was at the

---

[2] In *Collopy,* the court pointed out that the common law has always had the inherent capacity to develop and adapt itself to current needs and that if this were not true it would have withered and died long ago rather than have grown and flowered so gloriously. See *Henningsen v. Bloomfield Motors, Inc.,* 32 *N. J.* 358 (1960); *Smith v. Brennan,* 31 *N. J.* 353 (1960); *Faber v. Creswick,* 31 *N. J.* 234 (1959); *cf. State v. Culver,* 23 *N. J.* 495, 505 (1957), *cert.* denied, 354 *U. S.* 925, 77 *S. Ct.* 1387, 1 *L. Ed. 2d* 1441 (1957), where Chief Justice Vanderbilt had this to say:

"One of the great virtues of the common law is its dynamic nature that makes it adaptable to the requirements of society at the time of its application in court. There is not a rule of the common law in force today that has not evolved from some earlier rule of common law, gradually in some instances, more suddenly in others, leaving the common law of today when compared with the common law of centuries ago as different as day is from night. The nature of the common law requires that each time a rule of law is applied it be carefully scrutinized to make sure that the conditions and needs of the times have not so changed as to make further application of it the instrument of injustice. Dean Pound posed the problem admirably in his *Interpretations of Legal History* (1922) when he stated, 'Law must be stable, and yet it cannot stand still.' And what has been done in the past is but one of the factors determinative of the present course of our law—a truism which has not gone unrecognized among the great thinkers of the legal profession."

Philadelphia College of Osteopathy. The Law Division found the requirement to be contrary to the public policy of our State and entered judgment directing that the Society admit him to full membership. On appeal, its judgment was sustained in an opinion which, after pointing out that the Society had virtually monopolistic power to preclude Dr. Falcone from successfully continuing his practice and to restrict his patients in their freedom of choice of physicians, held that public policy dictated that this power was not to remain unbridled but was to "be viewed judicially as a fiduciary power to be exercised in reasonable and lawful manner for the advancement of the interests of the medical profession and the public generally." 34 *N. J.*, at *p.* 597. Supporting reference was made to various decisions including *Wilson v. Newspaper, etc., Union*, 123 *N. J. Eq.* 347, 351 (*Ch.* 1938), where Vice Chancellor Bigelow had appropriately suggested that where a labor union has a virtual monopoly it is under a fiduciary duty not to exercise its membership power in arbitrary fashion. See Note, "Judicially Compelled Admission to Medical Societies: The Falcone Case," 75 *Harv. L. Rev.* 1186, 1192 (1962); "Developments in the Law—Judicial Control of Actions of Private Associations," 76 *Harv. L. Rev.* 983, 1004 (1963); see also Annotation, "Compelling admission to membership in professional association or society," 89 *A. L. R. 2d* 964 (1963).

In *Falcone*, the Society had taken the position that it was a private organization whose admissions policy was immune from judicial disturbance. In response, it was pointed out that the Society was not a voluntary membership association in which the public had little or no concern but was, rather, an association in which the public was vitally concerned and which was engaged in activities directly affecting the health and welfare of the people. In the course of its opinion, the court expressed the following thoughts which are particularly pertinent in view of the comparable position of the defendants here:

"The persistent movement of the common law towards satisfying the needs of the times is soundly marked by gradualness. Its step by step process affords the light of continual experience to guide its future course. See *Walker, Inc. v. Borough of Stanhope*, 23 *N. J.* 657, 666 (1957). When courts originally declined to scrutinize admission practices of membership associations they were dealing with social clubs, religious organizations and fraternal associations. Here the policies against judicial intervention were strong and there were no significant countervailing policies. When the courts were later called upon to deal with trade and professional associations exercising virtually monopolistic control, different factors were involved. The intimate personal relationships which pervaded the social, religious and fraternal organizations were hardly in evidence and the individual's opportunity of earning a livelihood and serving society in his chosen trade or profession appeared as the controlling policy consideration. Here there have been persuasive indications, as noted earlier in this opinion, that in a case presenting sufficiently compelling factual and policy considerations, judicial relief will be available to compel admission to membership; we are entirely satisfied, as was Judge Vogel in the Law Division, that Dr. Falcone has presented such a case." 34 *N. J.*, at *p.* 596

In essence, *Falcone* declared, on strong policy grounds, that the Medical Society's authority to pass on membership applications by licensed physicians is a power which is fiduciary in nature, to be exercised accordingly, and it held that, under the evidence presented, Dr. Falcone was entitled to admission despite the Society's requirement of four years' study at a school approved by the American Medical Association. It is evident that, though we are here concerned with a hospital rather than a medical society, similar policy considerations apply with equal strength and call for, a declaration that the hospital's power to pass on staff membership applications is a fiduciary power, and a holding that Dr. Greisman is entitled to have his application evaluated on its own individual merits without regard to the bylaw requirement rejected by the Law Division. His personal and professional qualifications are not in dispute here, he lives in Vineland, has an office in Newfield in the Vineland metropolitan area, has an unrestricted license to practice medicine and surgery, and is engaged in the general practice of medicine. All he seeks, at this juncture, is simply

permission to file his application for membership on the courtesy staff of the Newcomb Hospital and have it considered to the end that, if he is passed on favorably in accordance with the hospital's valid bylaws, he and his patients, as such, will have hospital facilities when needed.

The Newcomb Hospital is the only hospital in the Vineland metropolitan area and it is publicly dedicated, primarily to the care of the sick and injured of Vineland and its vicinity and, thereafter to the care of such other persons as may be accommodated. Doctors need hospital facilities and a physician practicing in the metropolitan Vineland area will understandably seek them at the Newcomb Hospital. Furthermore, every patient of his will want the Newcomb Hospital facilities to be readily available. It hardly suffices to say that the patient could enter the hospital under the care of a member of the existing staff, for his personal physician would have no opportunity of participating in his treatment; nor does it suffice to say that there are other hospitals outside the metropolitan Vineland area, for they may be too distant or unsuitable to his needs and desires. All this indicates very pointedly that, while the managing officials may have discretionary powers in the selection of the medical staff, those powers are deeply imbedded in public aspects, and are rightly viewed, for policy reasons entirely comparable to those expressed in *Falcone*, as fiduciary powers to be exercised reasonably and for the public good.

It must be borne in mind that we are not asked to pass on a discretionary exercise of judgment but only on the validity of the bylaw requirement. Therefore, we need not concern ourselves with any of the larger issues relating to discretionary limits or the general lengths to which a hospital may go in conditioning staff admissions on the approval of outside bodies. Viewed realistically, our proper concern here is whether the hospital had the right to exclude consideration of the plaintiff, solely because he was a doctor of osteopathy and had not been admitted, because of his osteopathic schooling, to his County Medical Society. In the light of *Falcone*

and its aftermath and the discrediting of the notion that doctors of osteopathy are merely cultists and may not safely be permitted to associate with doctors of medicine,[3] it is clear to us that it had no such right. In this day there should be no hesitancy in rejecting as arbitrary, the stand that a doctor of osteopathy, though fully licensed by State authority and reputably engaged in the general practice of medicine and as the local school and plant physician, is nonetheless automatically, and without individual evaluation, to be considered unfit for staff membership at the only available hospital in the rather populous metropolitan area where he resides and practices. The public interest and considerations of fairness and justness point unerringly away from the hospital's position and we agree fully with the Law Division's judgment rejecting it.

Hospital officials are properly vested with large measures of managing discretion and to the extent that they exert their efforts toward the elevation of hospital standards and higher medical care, they will receive broad judicial support. But they must never lose sight of the fact that the hospitals are operated not for private ends but for the benefit of the public,

---

[3] See "AMA House Shifts Stand on Osteopathy," *Am. Hospital A. J.*, Aug. 1, 1961, *p.* 47; "Report of Judicial Council," 184 *A. M. A. J.* 356 (May 4, 1963). The latter report notes that three out of four osteopaths in the United States may soon be involved in voluntary professional association with physicians and that today two-thirds of the doctors of osteopathy are practicing either in states in which the medical societies permit voluntary association of medical doctors and doctors of osteopathy or in the State of California where the two professions have merged; it notes further that almost ninety per cent of the doctors of osteopathy practice in states which grant unrestricted licenses to them and that such licenses are granted in the following states plus the District of Columbia: Alabama, Arizona, Colorado, Connecticut, Delaware, Florida, Hawaii, Illinois, Indiana, Iowa, Kansas, Kentucky, Maine, Massachusetts, Michigan, Minnesota, Missouri, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin and Wyoming.

and that their existence is for the purpose of faithfully furnishing facilities to the members of the medical profession in aid of their service to the public. They must recognize that their powers, particularly those relating to the selection of staff members, are powers in trust which are always to be dealt with as such. While reasonable and constructive exercises of judgment should be honored, courts would indeed be remiss if they declined to intervene where, as here, the powers were invoked at the threshold to preclude an application for staff membership, not because of any lack of individual merit, but for a reason unrelated to sound hospital standards and not in furtherance of the common good.

Affirmed.

*For affirmance* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.