**Robert C.G. HOTTENTOT**

v.

**MID–MAINE MEDICAL CENTER.**

Supreme Judicial Court of Maine.

Argued June 17, 1988.
Decided Oct. 21, 1988.

Martin L. Wilk (orally), Eaton, Peabody, Bradford & Veague, Brunswick, for plaintiff.

George Z. Singal (orally), Sean F. Faircloth, Gross, Minsky, Mogul & Singal, Bangor, for defendant.

Before McKUSICK, C.J., and ROBERTS, WATHEN, GLASSMAN, SCOLNIK,* CLIFFORD and HORNBY, JJ.

WATHEN, Justice.

Plaintiff Robert C.G. Hottentot appeals from an order of the Superior Court (Kennebec County, Brennan, J.) granting summary judgment to defendant Mid–Maine Medical Center. The Superior Court found no basis for reviewing the staffing decision of a private, non-profit hospital. Finding no error we affirm the judgment.

Plaintiff is an osteopathic orthopedic surgeon practicing in Waterville. He is fully licensed by the State of Maine and is a member of the medical staff at both Sebasticook Valley Hospital (Pittsfield) and Waterville Osteopathic Hospital. For a time he was Chief of Surgery at Waterville Osteopathic. Dr. Hottentot has applied twice for surgical staff privileges at Mid–Maine Medical Center. His most recent application was rejected because he did not meet the requirements of the Hospital's Rule D–1. This Rule requires that an applicant for surgical staff privileges "must be qualified for examination by the American Board of Surgery or one of its sub-specialty boards or be so certified . . . ." In order to take the American Board of Surgery examination, a physician must first serve a residency program approved by that Board. Dr. Hottentot's residencies do not qualify because they were served primarily at osteopathic institutions.[1] Three osteopathic physicians have qualified under the Rule and been admitted to staff privileges at the Hospital.

Dr. Hottentot brought a seven-count complaint against the Mid–Maine Medical Center seeking consideration of his application without regard to Rule D–1. The complaint asserts that the Hospital's application of Rule D–1 violates regulations promulgated by the State Department of Human Services; that the Rule is contrary to the Hospital By-laws; that the decision to deny Dr. Hottentot's application is contrary to the By-laws; that Rule D–1 is arbitrary, capricious, unreasonable and unlawful because Dr. Hottentot's residency program was equivalent to the American Medical Association-approved residency program and he was excluded solely because it was osteopathic rather than allopathic; that the Hospital denied Dr. Hottentot a fair hearing in refusing to permit him to have counsel at the hearing or to present certain evidence and in failing to comply with its own time limits; that Rule D–1 and the decision to deny Dr. Hottentot's application violate State public policy and are unreasonable, arbitrary and capricious, as well as substantively irrational and procedurally unfair and unlawful; and that Dr. Hottentot's application should have been judged by the standards in effect in August of 1981 when he submitted an earlier application that was not approved.

After issue was joined both Dr. Hottentot and the Hospital filed motions for summary judgment with supporting affidavits. No genuine issue of material fact emerged. After a hearing, the Superior Court granted the Hospital's motion for summary judgment on the ground that it had no jurisdiction to review the staffing decisions of a private, non-profit hospital such as Mid–Maine Medical Center. It is from this decision that Dr. Hottentot has appealed.

## VIOLATION OF STATE REGULATION

■ We address first the assertion that the Hospital's action violated a Department of Human Services regulation. The trial court did not explicitly rule on this issue. Its decision focused instead on whether Dr.

---

* SCOLNIK, J., sat at oral argument and participated in the initial conference but resigned before this opinion was adopted.

1. Portions—perhaps as much as ⅓—could qualify because they were served under allopathic physicians.

Hottentot has a common law cause of action, an issue whose resolution does not determine whether he has a claim for breach of the regulation. The parties have addressed in this Court the substance of the regulation without considering whether a physician may bring a private cause of action to enforce it. We conclude that enforcement is for the Department through licensing sanctions or prosecution, not a private physician in a civil action.

Maine statutes require that any person or association operating a hospital obtain a state license. 22 M.R.S.A. § 1811 (1980). Section 1817 permits the Department to condition the license upon meeting Department standards. Section 1820 grants the Department "power to establish reasonable standards ... which it finds to be necessary and in the public interest." The Department has in fact adopted regulations whose coverage extends to issues of medical staff qualifications.[2] They require that members of the medical staff be "qualified legally, professionally, and ethically for the positions to which they are appointed." The medical staff must have a system, "based on definite workable standards, to evaluate each applicant;" and privileges must be extended to "duly licensed qualified physicians" in the "appropriate fields ... according to individual qualifications." Membership may not be "dependent solely upon certification, fellowship, or membership in a specialty, body or society." Instead, "[a]ll qualified candidates [must be] considered by the credentials committee." In the specific provision pointed to by Dr. Hottentot, the regulation requires that "[c]riteria for selection are individual character, competence, training, experience, and judgment."

■ Dr. Hottentot emphasizes the use of the word "individual" in the regulation, and maintains that a blanket requirement of eligibility for the ABS examination eliminates consideration of his individual characteristics. This argument is not persuasive. Obviously the Department did not intend to prohibit all credentials requirements (such as graduation from a medical school) and require a hospital to assess each applicant's medical knowledge independently of education and training. *See Hull v. Board of Commissioners of Halifax Hospital Medical Center*, 453 So.2d 519, 523 (Fla.Dist.Ct. App.1984) (statutory requirement of consideration on an individual basis requires only "that uniform standards be applied equally").

We are more troubled by the import of the Department's outright prohibition of criteria "dependent solely upon certification ... in a specialty body" like the ABS. Neither party sheds any light on the scope of this provision and whether Rule D–1 is consistent with it.

Whatever its scope, however, the regulation is adopted pursuant to a licensing program. The sanction provided by statute for failure to comply with Department regulations is to make the hospital's license temporary or conditional and ultimately suspend or revoke it if necessary. 22 M.R.S.A. § 1817 (1980). In addition, criminal penalties are explicitly provided for violation of the Department's regulations. *Id.* at § 1821. We have stated in *Larrabee v. Penobscot Frozen Foods, Inc.*, 486 A.2d 97, 101 (Me.1984), that we will recognize a private cause of action to enforce a statute only where the legislative intent to create such a remedy is clear. The same standard should apply to enforcement of regulations, and we see no such intent here. Instead the Legislature has clearly enumerated the sanctions: license conditions and suspensions and criminal penalties. Accordingly, if there has been any violation of the licensing standards, Dr. Hottentot should address his complaint to the Department rather than the courts.

## COMMON LAW CAUSE OF ACTION

■ Alternatively, Dr. Hottentot asks us to recognize a physician's right to judicial review of a private hospital's decision to deny his or her application for staff privileges.[3] We have not previously recognized

---

**2.** Regulations for the License of General and Specialty Hospitals in the State of Maine, ch. IX.

**3.** The parties agree that no constitutional principles are at stake, no judicial review of agency

such a cause of action with respect to any private institution—hospitals, colleges, museums or otherwise.

Common law courts were traditionally reluctant to intervene in the affairs of nonprofit organizations or associations. *See generally* Chafee, *The Internal Affairs of Associations Not for Profit*, 43 Harv.L. Rev. 993 (1930). When they did intervene, it was often to deal with expulsions from membership and the theories for intervention failed to develop any coherent judicial approach. *Id.* Commentators, however, urged the courts to intervene because of the sometimes severe effects on individuals caused by the private organization's activities, particularly in instances where the organization had gained effective monopoly power over an area like a profession. *See, e.g.*, Note, *Judicial Control of Actions of Private Associations*, 76 Harv.L.Rev. 983 (1963).

The clearest break with the traditional approach occurred in 1961 in a New Jersey Supreme Court decision, *Falcone v. Middlesex Medical Society*, 34 N.J. 582, 170 A.2d 791 (1961). Dr. Falcone lost his associate membership in the Middlesex Medical Society because he received his training at an osteopathic school. Without that membership, he could not obtain hospital privileges at any hospital within the county. The New Jersey Supreme Court announced that it would recognize a private cause of action to review such exclusions because they affected profoundly both a doctor's ability to practice and the public interest in health care. 170 A.2d at 799. In 1963, New Jersey extended this principle to the

staff privilege decisions of a private nonprofit hospital, *Greisman v. Newcomb Hospital*, 40 N.J. 389, 192 A.2d 817 (1963). The court intervened in *Greisman* because of the hospital's dedication to the public, its receipt of public benefits and public donations, and its role as the only hospital in a metropolitan area (as a result of which it could limit severely a doctor's ability to practice medicine and a patient's choice of doctors). In both *Falcone* and *Greisman* the court announced that it would review such decisions for arbitrariness.

Subsequently, nine other jurisdictions followed suit in opening the staffing decisions of private hospitals to judicial review on a common law basis.[4] The trend, however, has not been uniform. In our neighboring jurisdictions, for example, Massachusetts adheres to the traditional view, *see Bello v. South Shore Hospital*, 384 Mass. 770, 429 N.E.2d 1011 (1981), whereas New Hampshire and Vermont follow *Greisman* at least in instances of dismissal. *Bricker v. Sceva Speare Memorial Hospital*, 111 N.H. 276, 281 A.2d 589 (1971); *Woodard v. Porter Hospital, Inc.*, 125 Vt. 419, 217 A.2d 37 (1966). In the most recent case on this issue, the Illinois Supreme Court explicitly rejected the *Greisman* approach and adhered to the traditional doctrine of refusing to intervene. *See Barrows v. Northwestern Memorial Hospital*, 123 Ill. 2d 49, 121 Ill.Dec. 244, 525 N.E.2d 50 (1988).

■ The present case does not involve any monopolization of hospital access and we are simply not presented with the facts

---

action, no contractual relationship between the physician and the hospital, and no monopolization of hospital access.

**4.** *See Storrs v. Lutheran Hospitals and Homes Society of America, Inc.*, 609 P.2d 24 (Alaska 1980); *Homes v. Hoemako Hospital*, 117 Ariz. 403, 573 P.2d 477 (1977); *Anton v. San Antonio Community Hospital*, 19 Cal.3d 802, 140 Cal. Rptr. 442, 567 P.2d 1162 (1977); *Hawkins v. Kinsie*, 540 P.2d 345 (Colo.1975); *Silver v. Castle Memorial Hospital*, 53 Haw. 475, 497 P.2d 564 (1972); *Bricker v. Sceva Speare Memorial Hospital*, 111 N.H. 276, 281 A.2d 589 (1971); *Kelly v. St. Vincent Hospital*, 102 N.M. 201, 692 P.2d 1350 (1984); *Davidson v. Youngstown Hospital Association*, 19 Ohio App.2d 246, 250 N.E.2d 892

(1969); *Woodard v. Porter Hospital, Inc.*, 125 Vt. 419, 217 A.2d 37 (1966).

Several of these courts have called specific attention to the unique circumstances of their states. Rural environments with limited hospital choices pose severe limitations to both doctors and patients in gaining access to a hospital and, in these courts' views, justify judicial intervention to review for arbitrariness. *See, e.g., Storrs v. Lutheran Hospitals and Homes Society of America, Inc.*, 609 P.2d at 28; *Peterson v. Tuscon General Hospital, Inc.*, 114 Ariz. 66, 71, 559 P.2d 186, 191 (1977); *Kelly v. St. Vincent Hospital*, 102 N.M. at 203–04, 692 P.2d at 1352–53.

that prompted the New Jersey Supreme Court to recognize a right of judicial review for the actions of private, non-profit hospitals. Judicial prudence dictates that we await the presentation of a truly comparable case before adopting, or rejecting, the *Falcone–Greisman* line of authority. On this record the Superior Court correctly found no basis for judicial review.[5]

The entry is:

JUDGMENT AFFIRMED.

ROBERTS, GLASSMAN, and CLIFFORD, JJ., concur.

HORNBY, Justice, with whom McKUSICK, Chief Justice, joins, concurring.

The central issue of this case is whether we should exercise our undoubted authority to create a new common law cause of action. Although I agree with the result the Court reaches, I do not agree that judicial prudence dictates that we examine the question solely in terms of whether our case matches New Jersey precedents.[1] Instead, I believe that we should make our own analysis within the context of circumstances here in Maine.

The Plaintiff's argument for a new cause of action recalls an earlier era when the courts created remedies against innkeepers and common carriers to ensure that they provided service without discrimination. *See generally* Wyman, *The Law of the Public Callings as a Solution to the Trust Problem,* 17 Harv.L.Rev. 156 (1904). In the case of innkeepers judicial intervention enabled travelers to find a secure lodging in situations where there was often only one inn available. In the case of common carriers a similar principle was at stake, namely, the carriers' ability to monopolize the means of shipping goods to market. But in both instances judicial intervention

was necessary because these industries were then virtually unregulated.

Private hospitals in Maine in the 1980's are, by contrast, extensively regulated. The Maine Human Rights Act, for example, prohibits all forms of invidious discrimination on bases such as race, sex and religion. 5 M.R.S.A. §§ 4551–4632 (1979 & Supp.1987). This statute encompasses hospital admissions, employment decisions, and staff privileges. State antitrust law prohibits attempts to monopolize commerce. 10 M.R.S.A. § 1102 (1980). This statute likewise encompasses hospitals and prohibits any attempt to exclude competing doctors from economic benefits. Maine's hospital licensing statute specifically regulates the activities of hospitals, and does so in detail. 22 M.R.S.A. §§ 1811–1827 (1980 & Supp.1987). Under its authority the Department of Human Services has promulgated regulations imposing limits on what hospitals can do in the specific area of staffing privileges. (Portions of "Regulations for The License of General and Specialty Hospitals in the State of Maine" are quoted by the Court in discussing whether Dr. Hottentot has a cause of action for their breach.) Finally, many kinds of extensive and detailed regulations have been imposed on hospitals through the federal government and the state government as a result of the Medicare and Medicaid Programs. *See, e.g.,* 42 U.S.C.A. §§ 1302, 1312, 1320a–2(a) (1983 & Supp.1988); 22 M.R.S.A. §§ 3172–3188 (1980 & Supp.1987).

I believe that we should examine the question whether to create a new cause of action against this background of extensive involvement by other agencies of government, a background that exists for hospitals both with monopoly power and without. Despite this extensive involvement, the legislative and executive branches have not been prompted in the area of medical staff exclusions to go beyond the licensing

---

**5.** In light of our holding and in light of the fact that Dr. Hottentot has no other relationship to this hospital we conclude that he has no standing to pursue the assertions made in the remaining Counts of his complaint.

**1.** Other jurisdictions have created the cause of action without finding the monopoly power the

Court deems critical. *E.g., Anton v. San Antonio Community Hospital,* 19 Cal.3d 802, 140 Cal. Rptr. 442, 567 P.2d 1162 (1977); *Silver v. Castle Memorial Hospital,* 53 Haw. 475, 497 P.2d 564 (1972); *Hawkins v. Kinsie,* 540 P.2d 345 (Colo. App.1975).

standards described by the Court. I would rest our decision on that basis, not on the failure of proof of monopolization. When the legislature passes a statute, we do not lightly assume that a new cause of action should be recognized to enforce it. Instead we wait for an expression of intent that the statute contemplates a private cause of action. *Larrabee v. Penobscot Frozen Foods, Inc.,* 486 A.2d. 97, 101 (Me.1984). When the legislative and the executive branches have the extensive involvement they do in this area and yet have declined to provide judicial remedies for grievances such as Dr. Hottentot's, I believe that we should likewise stay our hand as a common law court. The appellate process provides only a limited insight into whether staff exclusion is a problem in Maine.

Consequently, I agree that we should not create a new cause of action, but conclude that it is ill-advised to approach the issue on a case-by-case basis, holding open the possibility of granting more protection in some cases than the legislature and executive have already provided. We do the practicing bar and its clients who pay the bills no service in fostering this sort of uncertainty. I would hold, therefore, that the common law cause of action does not exist in Maine, regardless of the monopoly factor.

As to the other issues, I concur fully in the Court's reasoning.