FLORO GUERRERO AND AMADO V. VIVES, PLAINTIFFS-RESPONDENTS, v. BURLINGTON COUNTY MEMORIAL HOSPITAL, THE BOARD OF DIRECTORS OF BURLINGTON COUNTY MEMORIAL HOSPITAL AND SOUTHERN OCEAN COUNTY HOSPITAL, DEFENDANTS-APPELLANTS.

Argued October 6, 1975—Decided June 10, 1976.

*Mr. Joseph H. Kenney* argued the cause for appellants (*Messrs. Archer, Greiner and Read,* attorneys; *Mr. Kenney* on the brief).

*Mr. Thomas J. Muccifori* argued the cause for respondents (*Messrs. Lomell, Muccifori, Adler, Kearney, Ravaschiere and Amabile,* attorneys).

The opinion of the Court was delivered by

MOUNTAIN, J. Plaintiffs, Dr. Floro G. Guerrero and Dr. Amado V. Vives, applied for admission to the medical staff of Burlington County Memorial Hospital for the purpose of practicing general surgery at Southern Ocean County Hospital (SOCH), a satellite[1] facility operating under the spon-

---

[1] "A 'satellite' is defined as an organized unit of an existing hospital (200 beds or larger) operated under the direction and control of one board of trustees, one medical staff, the same by-laws and license, and providing facilities and services in those geographical areas where it is either inconvenient or uneconomical for the community to provide the broad range of services normally found in an acute general hospital." [*New Jersey State Department of Health, Manual of Standards for Hospital Facilities,* 1972, Appendix D]

sorship of Burlington County Memorial Hospital. The applications of both doctors, whose qualifications have never been questioned, were denied by the Board of Trustees of Burlington County Memorial Hospital on December 19, 1972. Motivating the denial of staff privileges was the Trustees' belief that it would be in the best interest neither of the satellite hospital nor of the community served by SOCH to enlarge its general surgery staff, given its limited bed capacity. After being notified of the denial of their applications, both doctors requested a hearing before the Joint Conference and Credentials Committees. The hearing was conducted on February 12, 1973 and on February 27, 1973 the Board of Trustees again voted to deny plaintiffs' applications.

Thereafter plaintiffs instituted the present action seeking to compel their admission to the medical staff of Burlington County Memorial Hospital, with full surgical privileges at SOCH. The trial court, concluding that the decision to deny surgical privileges was arbitrary, that it would not foster the well being of the community served by the hospital, and that it did not have a reasonable relationship to the criteria promulgated by the State for satellite hospitals, granted the relief sought by plaintiffs. The Appellate Division affirmed in an unreported per curiam opinion, determining that the evidence presented at trial "more than adequately supports the findings and conclusions of the trial court." We granted defendants' petition for certification, 68 *N. J.* 168 (1975), and now reverse.

It is our conclusion that the decision of the Board of Trustees should not have been disturbed upon judicial review. The determination was supported by substantial credible evidence and was neither arbitrary nor capricious.

A brief review of the events leading up to the Trustees' decision is essential to an understanding of the result we reach. In the mid-fifties, the Southern Ocean County Hospital Association was formed to establish a hospital intended to serve Long Beach Island and surrounding communities.

The Association was unable to raise sufficient funds to finance a facility of 100 beds, the minimum required by the state for an independent hospital. Accordingly it sought the sponsorship of an existing general hospital for the creation of an affiliated satellite facility. To this end, the Department of Institutions and Agencies[2] sent a letter on July 19, 1968 to all licensed hospitals describing the Association's interest in establishing a new hospital and in securing an affiliation with an existing general hospital which would sponsor and administer the subordinate facility. Only one hospital responded to the announcement, and negotiations with that institution were unproductive. In 1969 Burlington County Memorial Hospital was approached for sponsorship. After preliminary negotiations, a Statement of Intent was executed by Burlington County Memorial Hospital and the Southern Ocean Community Hospital Association. Thereafter Southern Ocean County Hospital was incorporated and on June 27, 1972 a formal written agreement was entered into between the two institutions.

Meanwhile criteria for satellite hospitals were developed by the State. These criteria, promulgated by the New Jersey State Department of Health, were incorporated in the Manual of Standards for Hospital Facilities. It is there made clear that the purpose of a satellite facility is distinct from that of a general hospital. The former is neither designed nor intended to provide the full range of services available at a general hospital. Rather, it is designed primarily to provide a particular community or region with a facility for the treatment of urgent and emergency cases.[3] As explained both by

---

[2]Administrative supervision of hospitals was transferred from the Department of Institutions and Agencies to the State Department of Health in 1971. *N. J. S. A.* 26:2H–1 *et seq.*

[3]The criteria provide:
2. *Professional Medical Services*
a. Professional medical services shall be the responsibility of the sponsoring institution and should be regulated by its constitution, by-laws, rules and regulations.

the Administrator of Burlington County Memorial Hospital and by plaintiffs' expert, an urgent case is one which, in the judgment of the treating physician, must be admitted to a hospital within 48 hours for treatment. An emergency case is one where, because of the seriousness of the patient's condition, immediate treatment is required. All other cases are designated as elective.

The procedure for staffing a satellite facility is also set forth among the criteria. It is there stated that:

a. There shall be but one medical staff for both facilities. The physicians serving the "satellite" shall be given staff appointments in accordance with the procedures and requirements of the sponsoring institution as described in its constitution, by-laws, rules and regulations. [*New Jersey State Department of Health, Manual of Standards for Hospital Facilities, supra*, at D–2]

In accordance with this regulation, and pursuant to the agree-

b. Professional medical services should include, but not be limited to, the following:

(1) Emergency room service: Staffed on a 24-hour basis, by licensed physicians or house staff supplemented by local physicians on an "on-call" basis as the need requires. The emergency room shall include adequate facilities and equipment for such emergencies as cardio-pulmonary resuscitation, etc.

(2) Hospitalization for urgent and emergency cases: If the required medical service is of a limited nature, hospitalization may be provided in the "satellite." If medical service requires comprehensive or specialized medical care, the patient may be transferred to the sponsoring institution or the specialty service brought to the "satellite."

(3) Specialized medical care should be available to the "satellite" at all times.

(4) Facilities for emergencies requiring limited surgical procedures, primarily those associated with accidental injuries, should be provided. If provided, such facilities shall be staffed with qualified personnel.

(5) Emergency delivery room service should be provided. As soon as possible after emergency delivery, the mother and newborn shall be transported to the sponsoring institution. If provided, such facilities shall be staffed with qualified personnel.

(6) Radiologic services as required to provide emergency care shall be staffed with qualified technical personnel.

(7) Clinical laboratory services as required to provide emergency care shall be staffed with qualified technical personnel. This should include electrocardiographic service.

ment between the sponsoring and satellite hospitals, the task of staffing SOCH was entrusted to Burlington County Memorial Hospital. Specific department heads were given the responsibility of securing adequate and competent personnel for their respective departments. It thus became incumbent upon Dr. William R. Muir, as chief of the department of surgery at Burlington, to staff the surgical department at SOCH. Mindful of the limited primary function of a satellite hospital — namely, to treat urgent and emergency cases — Dr. Muir initially confined his efforts to finding — as he put it — a "dynamic" individual to become the nucleus of the surgical department at SOCH. It was contemplated that this individual would work full-time at the satellite and that he would be capable of functioning without the aid of supporting surgical personnel. "Back-up" would be provided by the surgical staff practicing at Burlington.

When the plaintiffs' applications for staff privileges were received on July 5, 1972, SOCH was still under construction and the surgical requirements of the facility, beyond its obvious need for a primary surgeon, had not been definitely determined. At that time both plaintiffs were employed as emergency room physicians, Dr. Vives in Paul Kimball Hospital in Lakewood and Dr. Guerrero in Point Pleasant Hospital. Neither had previously practiced as a private surgeon. Anticipating such a practice and mindful of the construction of SOCH as well as the lack of surgeons in the area, they had jointly opened an office in June of 1972 in Forked River. They also applied to Community Memorial Hospital in Toms River for staff privileges.

Plaintiffs were jointly interviewed by Dr. Muir on August 1, 1972. Neither was considered for the position of primary surgeon because Dr. Muir at once concluded that they were not sufficiently dynamic, self-assured or experienced to fill this role. Ultimately, one Dr. Begley was secured to fill the post.

On September 11, 1972, the Joint Conference Committee, acting upon the recommendation of the Medical Executive

Committee, deferred final consideration of plaintiffs' privileges for three months, until the staffing needs of SOCH could be more precisely assessed. The satellite, licensed for 60 beds, had opened in August of 1972 with 52 beds and contained an x-ray department, a laboratory, two operating rooms, an emergency room and a small out-patient area. While the hospital beds were not designated as being either medical or surgical, the occupancy figures for the early months of its operation established an almost 3 to 1 ratio of medical to surgical beds. Additionally, the occupancy figures indicated that the facility was running at a very high capacity, contrary to the expectation that only a 60% occupancy rate would be reached during the winter months. Because of these factors — the relationship of medical-surgical cases and the high percentage of occupancy — it became evident to Dr. Muir that an increase in the number of surgeons practicing at SOCH would be disadvantageous. He perceived that an enlargement of the surgical staff at SOCH — at least at that time — was likely to effect an immediate increase in the surgery performed at the institution and thereby overtax the facility and diminish the quality of patient care. Fearing this result, it was determined not to expand the surgical staff at that time.[4]

On December 14, 1972 the Medical Executive Committee met to reconsider plaintiffs' applications which had been deferred; it voted to recommend denial of the appointments. The Board of Trustees, on December 19, 1972, concurred in this recommendation. By letter dated January 5, 1973, it notified the plaintiffs of its decision but gave no reasons for the action taken. Plaintiffs were, nevertheless, informed of a right to have the decision reviewed before it became final,

---

[4]It had previously been concluded that uninterrupted surgical coverage by a team would be desirable. For this purpose, Dr. Begley selected as his partner a Dr. Konylian, who formally applied on December 19, 1972 and was approved by the Board of Trustees on February 27, 1973.

such review to be in the form of a hearing before the Joint Conference and Credentials Committees. The hearing in fact took place. As a result thereof it was again recommended that plaintiffs' applications be denied for the following reason:

Because of the limited bed capacity existing at this satellite hospital, it would not be in the best interest of the general public of the community serviced by Southern Ocean County Hospital to enlarge the surgery staff.

The Board of Trustees, after reviewing plaintiffs' application in detail, voted again to deny the applications. In arriving at this determination, the Board considered the following specific factors: (1) the size of the satellite facility; (2) that the hospital was operating at near capacity during the winter months in contrast to the anticipated occupancy rate of 60%; (3) that the surgical coverage at the facility was presently adequate; (4) that an enlargement of the surgical staff would lead to an increase in the surgery performed at the institution; and (5) that the needs of the community — which were largely medical — would not be served by such additional surgery. The Board did decide, however, that it would reconsider the plaintiffs' applications if SOCH were to expand its facilities. At approximately the same time that plaintiffs were denied appointments to the staff of Burlington County Memorial Hospital, they received full privileges at Community Memorial Hospital in Toms River.

Evidence adduced at trial made clear that the defendant Board of Trustees considered that any enlargement of the surgical staff at SOCH would have a corresponding adverse effect on the quality of patient care dispensed at the satellite. This would come about because an increase in surgeons would inevitably increase the amount of surgery, which would in turn overload the limited bed facilities and thereby very possibly prevent emergency cases from being treated. Moreover, it was not considered to be in the interest of the community served by SOCH, which had proven to have a far greater need for medical than for surgical treatment, to

disturb the rather delicate relationship that had been achieved between medical and surgical beds.

A number of explanations were offered at trial to show why an increase in the surgical staff would effect an increase in surgery. It was, for instance, pointed out that surgeons would be likely to channel patients who might otherwise be treated at other hospitals to SOCH when convenient. Even plaintiffs' expert admitted that there was a reasonable likelihood that surgeons might categorize elective cases as urgent in order to secure admission to the satellite facility.

Plaintiff's expert, however, did not consider a limited surgical staff as a reasonable solution to the problem of limited bed space. Rather, he proposed that the problem should be solved by an admissions officer or "gatekeeper" who could see that the public good was being served by controlling the admissions to the hospital. The feasibility of this solution was disputed by Dr. Muir, who envisioned difficulty in having such a person turn away emergency patients.

We believe that the evidence adduced at trial amply demonstrated that the Board of Trustees properly exercised its discretion in denying staff privileges to the plaintiffs. At the outset, we readily acknowledge that the exercise of discretion by a hospital Board of Trustees is a very delicate process, particularly when the Board is called upon to determine whether staff privileges should be granted to an applying physician or surgeon. It is readily apparent that staff privileges for a member of the medical profession are essential to a viable medical practice. This is especially true as to surgeons. Unlike other types of physicians, surgeons must have access to a hospital operating room or they are precluded from practicing the specialty for which they have been trained. ██ Counterbalancing the needs of the physician, however, are those of the hospital. It has a primary interest in maintaining the quality of patient care it affords to those in need. It is sometimes the difficult task of those who administer hospitals to weigh the relative merits of these two vital and sometimes competing considerations. At times the wis-

dom of the determination may be challenged. On such occasions a reviewing court should confine its effort to determining whether the decision made by the hospital is supported by substantial credible evidence and is neither arbitrary nor capricious. When a decision fulfills these requirements, a reviewing court should refrain from substituting its own judgment for that of the hospital authorities.

 It is well settled that this is the proper standard of review by which to measure the propriety of determinations of administrative agencies. *See, e. g., Close v. Kordulak Brothers,* 44 *N. J.* 589, 598–99 (1965); *Flanagan v. Department of Civil Service,* 29 *N. J.* 1, 12 (1959); *First Savings & Loan Association v. Howell,* 87 *N. J. Super.* 318, 321–22 (App. Div. 1965), certif. den. 49 *N. J.* 368 (1967); *Quinlan v. Board of Education,* 73 *N. J. Super.* 40, 46-47 (App. Div. 1962); *Tullo v. Township of Millburn,* 54 *N. J. Super.* 483, 498 (App. Div. 1959). We consider the same standard of review appropriate with respect to decisions of governing boards of hospitals, such as the determination here being examined. *See Duffield v. Memorial Hospital Association of Charleston,* 361 *F. Supp.* 398, 404 (S. D. W. Va. 1973); *Davidson v. Youngstown Hospital Association,* 19 *Ohio App.* 2d 246, 250 *N. E.* 2d 892, 896 (1969); *Benell v. City of Virginia,* 258 *Minn.* 559, 104 *N. W.* 2d 633, 636 (1960); *Grodjesk v. Jersey City Medical Center,* 135 *N. J. Super.* 393, 410 (Ch. Div. 1975). Such a standard defers to the expertise of hospital authorities concerning the operations of the hospital, while at the same time affording full opportunity for judicial intervention when there is no rational basis for the decision being reviewed, or it appears to be unreasonable, arbitrary or capricious.

 Our courts, as well as others. have consistently evinced a sensitivity to the need of hospital administrators to be able reasonably to exercise their discretion without judicial interference, at the same time remaining alert to strike down action that is discriminatory or unfair. As put

by Justice Jacobs in *Greisman v. Newcomb Hospital*, 40 *N. J.* 389, 403-04 (1963):

> Hospital officials are properly vested with large measures of managing discretion and to the extent that they exert their efforts toward the elevation of hospital standards and higher medical care, they will receive broad judicial support. But they must never lose sight of the fact that the hospitals are operated not for private ends but for the benefit of the public, and that their existence is for the purpose of faithfully furnishing facilities to the members of the medical profession in aid of their service to the public. They must recognize that their powers, particularly those relating to the selection of staff members, are powers in trust which are always to be dealt with as such. While reasonable and constructive exercises of judgment should be honored, courts would indeed be remiss if they declined to intervene where, as here, the powers were invoked at the threshold to preclude an application for staff membership, not because of any lack of individual merit, but for a reason unrelated to sound hospital standards and not in furtherance of the common good.

In short, judicial intervention will be restricted to situations in which the hospital action constitutes an unreasonable exercise of discretion.

In *Davis v. Morristown Memorial Hospital*, 106 *N. J. Super.* 33 (Ch. Div. 1969) the court had to determine the reasonableness of denying staff privileges to two qualified obstetricians. The denial resulted from a specific written hospital policy deferring all such privileges until an adequate number of beds could be provided in the obstetrics department. The court recognized that, on the one hand, the hospital had an occupancy problem in the obstetrics ward, but that on the other hand, plaintiffs might suffer a loss of patients were they denied privileges. The court refused to adopt plaintiffs' contention that it would have been less arbitrary for the hospital to provide multiple staff appointments and geographically limit admissions. Rather, the court noted that the focus of its attention should be on the reasonableness of the action "as it relates to 'sound hospital standards' in 'faithfully furnishing facilities to the members of the medical profession in aid of their service to the public.' "

*Id.* at 43. Assessing the action from this perspective, the court upheld the hospital's policy decision. *See also Blank v. Palo Alto-Stanford Hospital Center,* 234 *Cal. App.* 2d 377, 44 *Cal. Rptr.* 572 (1965).

We have thoroughly reviewed the record in the case at bar and cannot conclude, as did the trial court and Appellate Division, that the Trustees' decision to deny staff privileges to plaintiffs was arbitrary and not reasonably in furtherance of the goals of a satellite hospital. To the contrary, the decision was motivated by the Trustees' unwillingness to permit the quality of patient care at SOCH to deteriorate — an occurrence they deemed inevitable if the facility were overtaxed by additional surgical cases.

Nothing we have said should be in any way construed as suggesting that hospitals may routinely deny staff privileges to doctors moving into an area. Any denial of such privileges, if motivated by a desire to exclude newcomers in order to maintain the status quo of the staff, would not be judicially tolerated. Implicit in our opinion in *Falcone v. Middlesex County Medical Society,* 34 *N. J.* 582, 597 (1961) is the belief that the power to exclude must be reasonably and lawfully exercised in furtherance of the interests of both the public and the medical profession. A denial predicated upon exclusionary policies fostering only the well-being of those staff members who are already admitted would clearly be in derogation of the spirit of *Falcone.* Where, however, as here, a facility is designed to accommodate a very limited number of patients and is intended primarily to afford treatment of urgent and emergent cases, a showing that an augmented surgical staff will engender additional surgery to the detriment of the facility provides a thoroughly rational basis for the Trustees' exercise of discretion in denying surgical privileges.

Plaintiffs also contend that the Board of Trustees of Burlington County Memorial Hospital is estopped to deny staff privileges to the plaintiffs. They suggest they were led to believe they would be granted staff privileges and that they

relied on this assumption to their detriment. From our reading of the record, however, we are unable to discern any conduct on the part of the defendants which would reasonably mislead a physician in these circumstances. *See Dambro v. Union County Park Commission,* 130 *N. J. Super.* 450, 457 (Law Div. 1974). Furthermore, it appears that the only harm plaintiffs may have suffered was a failure to pursue more vigorously than they did their applications at Community Memorial Hospital in Toms River. Thus we remain unpersuaded that estoppel should find any place in this decision.

 Furthermore, some comment seems appropriate as to the Trustees' failure to apprise plaintiffs prior to their hearing of the reasons for the denial of their staff privileges. In *Sussman v. Overlook Hospital Ass'n,* 92 *N. J. Super.* 163, 179, 183 (Ch. Div. 1966), *aff'd,* 95 *N. J. Super.* 418 (App. Div. 1967), the court determined that a physician who had been denied staff privileges for personal reasons was entitled to notice of the specific reasons for denial prior to any hearing. *See also Birnbaum v. Trussell,* 371 *F.* 2d 672, 679, n. 15 (2d Cir. 1966); *Silver v. Castle Memorial Hospital,* 53 Haw. 475, 497 *P.* 2d 564, 571, *cert. den.* 409 *U. S.* 1048, 93 S. Ct. 517, 34 *L. Ed.* 2d 500 (1972); Note, *Denial of Hospital Staff Privileges: Hearing and Judicial Review,* 56 *Iowa L. Rev.* 1351, 1362-63 (1971). We note that reasons were in fact given at the time of plaintiffs' final denial following the full hearing. While lack of notice prior to the hearing will certainly not mandate reversal here, we believe that the more judicious practice would be for hospitals to notify *all* applicants who are denied staff privileges of the specific grounds, be they personal or policy reasons, for the denial. This will afford applicants a fuller opportunity to respond more effectively to the precise reasons that have led to their initial rejections.

In summary, the record is utterly barren of the kind of discriminatory conduct that moved us to act in *Falcone,*

*supra.* No surgeons other than Drs. Begley and Konylian have been added to defendant's staff, except for an orthopedic surgeon who presumably was added because of a need for his specialized skills. As we mentioned before, defendant has promised to give full consideration to any renewal of plaintiffs' applications should the satellite's facilities be later enlarged.

The judgment of the Appellate Division is reversed and judgment is entered in favor of defendants. No costs.

PASHMAN, J. (dissenting). The Court today upholds a hospital's decision to deny staff privileges to two qualified physicians. The hospital based its decision on the allegedly adverse effect which the physicians' admission to the staff would have had on the ability of the institution to provide quality medical care. Based on its review of the facts, the majority concludes that denial of plaintiffs' applications comported with both the internal needs of the hospital and the fiduciary duty which this Court has imposed on hospitals. Because the majority employs what I consider to be an incorrect standard of judicial review, I must dissent. The use of this standard inextricably colors the Court's analysis of the facts and its resolution of the issues. I fear that today's decision may represent an unfortunate retreat from the Court's former "advanced position [in] reviewing staff admissions to make certain that hospital officials exercise 'their powers in trust' in a lawful manner." *Davis v. Morristown Memorial Hosp.*, 106 *N. J. Super.* 33 (Ch. Div. 1969).

In reaching its decision, the majority employs the substantial credible evidence test. Ante at 356. This standard is a transplantation from the field of administrative law. *Mayflower Securities Co., Inc. v. Bureau of Sec.*, 64 *N. J.* 85, 92–93 (1973); *Close v. Kordulak Bros.*, 44 *N. J.* 589, 598–99 (1965); 4 *Davis, Administrative Law and Treatise*, § 29.01, 29.02 (1958). As a polestar for judicial review, it imposes a greater burden of proof on parties wishing to overturn an

administrative decision than do the comparable standards for parties appealing from the ruling of a judge or jury. 4 *Davis, supra,* at § 29.02. As such, the substantial credible evidence test recognizes the deference which courts accord the findings and expertise of administrative agencies.

While analogies between the decisions of hospitals and administrative agencies as to the pertinent standards of judicial review are appealing, they are at the same time inapposite. Unlike questions presented in administrative cases, the determination of the hospital's ability to accommodate the plaintiffs in this case is in the first instance neither statutorily assigned to, nor dependent upon, the expertise of the defendants. In addition, this case does not implicate a potential conflict between the judiciary and an agency of another branch of government which would warrant deference to that agency's determination.[1] Finally, and most importantly, hospitals, unlike most other public institutions, have been vested with a special public trust or fiduciary duty.

The parameters of this duty were first delineated in *Falcone v. Middlesex Cty. Medical Soc'y,* 34 *N. J.* 582 (1961). There, the defendant-medical society had denied admission

---

[1]This concern was expressed by the Court in *Flanagan v. Civil Service Dep't,* 29 *N. J.* 1 (1959), in which a determination by an administrative agency was upheld under the substantial credible evidence standard:

It is important to the efficient functioning of the public service employment program that "[c]ourts should let administrative boards and officers work out their problems with as little judicial interference as possible. They may decide a particular question wrong — but it is their decision. [They are] vested with high discretion, and its abuse must appear very clearly before the courts will interfere." *Maxwell v. Civil Service Commission,* 169 *Cal.* 336, 146 *P.* 869 (Sup. Ct. 1915). If there is any fair argument in support of the course taken or any reasonable ground for difference of opinion among intelligent and conscientious officials, *the decision is conclusively legisaltive,* and will not be disturbed unless patently corrupt, arbitrary or illegal. Doubts held by the courts as to the wisdom of the administrator's decision do not alter the case. [29 *N. J.* at 12; emphasis supplied]

to a doctor who met all prerequisites for societal membership except for an unwritten requirement of attendance at an approved medical school for four years. This Court, in striking down the requirement, not only acknowledged the society's almost exclusive control of local hospital facilities, but also recognized the inherently public character of the society. Because of the position which it occupied, the medical society wielded considerable influence and power over the furnishing of medical services to the area. For instance, it could promote or impede a physician's practice by denying him access to hospital facilities. Because an improper exercise of its power against a doctor could effectively deny him the opportunity to practice his profession, this Court held that the admissions power of the society was subject to certain restrictions:

> Through its interrelationships, the County Medical Society possesses, in fact, a virtual monopoly over the use of local hospital facilities. As a result it has power, by excluding Dr. Falcone from membership, to preclude him from successfully continuing in his practice of obstetrics and surgery and to restrict patients who wish to engage him as an obstetrician or surgeon in their freedom of choice of physicians. *Public policy strongly dictates that this power should not be unbridled but should be viewed judicially as a fiduciary power to be exercised in reasonable and lawful manner for the advancement of the interests of the medical profession and the public generally* . . . . [34 *N. J.* at 597; emphasis supplied]

An even clearer exposition of this responsibility, one which is particularly relevant to the present case, appeared in *Greisman v. Newcomb Hospital,* 40 *N. J.* 389 (1963). While the plaintiff there was again a physician, the organization which denied him staff privileges was a hospital. Plaintiff, an osteopath, sought admission to the courtesy staff of the hospital but was rejected because of his failure to attend an approved medical school for a requisite number of years. Not only was plaintiff denied admission to the staff, but he was also denied the opportunity to submit an application, even though he had an unrestricted State license to practice medicine. Tran-

scending distinctions which were previously drawn between public and private hospitals, this Court directed the defendant (a "private" hospital) to consider plaintiff's application. In rendering its decision the Court relied upon the same considerations which supported its decision in *Falcone, supra*. In addition, the Court discussed the relationship between the principles of the fiduciary responsibility vested in a hospital and the institution's permissible exercise of discretion:

> Hospital officials are properly vested with large measures of managing discretion and to the extent that they exert their efforts toward the elevation of hospital standards and higher medical care, they will receive broad judicial support. But they must never lose sight of the fact that the hospitals are operated not for private ends but for the benefit of the public, and that their existence is for the purpose of faithfully furnishing facilities to the members of the medical profession in aid of their service to the public. *They must recognize that their powers, particularly those relating to the selection of staff members, are powers in trust which are always to be dealt with as such.* While reasonable and constructive exercises of judgment should be honored, courts would indeed be remiss if they declined to intervene where, as here, the powers were invoked at the threshold to preclude an application for staff membership, not because of any lack of individual merit, but for a reason unrelated to sound hospital standards and not in furtherance of the common good. [40 *N. J.* at 403–404; emphasis supplied]

In applying these principles to the instant case, it should first be noted that defendants' hiring process itself was marked by arbitrariness and inconsistency. Plaintiffs submitted their applications for surgical privileges to the Southern Ocean County Hospital (hereinafter SOCH) on July 5, 1972. On September 12, 1972 they were notified that a decision on their applications would be postponed for three months "pending the establishment of the needs and the staffing patterns at the newly opened hospital." The trial judge found, however, that of all the applications submitted, only plaintiffs' were deferred for this reason. Other requests for admission were favorably received during the two and one-half months after that date. In fact, 11 other physicians were actually admitted to practice at SOCH be-

tween the time plaintiffs submitted their applications and the trial in this case. On January 5, 1975, plaintiffs were finally notified that their applications for admission had been denied; but, at that time, they were given no reasons for the denial.

The discriminatory treatment to which plaintiffs' applications were subjected, was exacerbated by the vague and mutable selection criteria utilized by defendants. In his initial rejection of plaintiffs as possible candidates for the position of chief surgeon, Dr. Muir relied heavily on his determination that they were not "dynamic enough."[2] This initial and primary decision as to who was "dynamic" had been solely entrusted to Dr. Muir and was based on the single interview which he conducted with each candidate. Even if one were to accept "dynamism" as a legitimate criterion for selection, it necessarily diminished in importance when, in fall 1972, the hospital reconsidered its needs and decided that coverage by a team of surgeons was preferable. Apparently, this policy was again changed by the time the board of trustees of the hospital rendered its final decision to deny plaintiffs' applications on February 28, 1973. Although only two surgeons had been granted staff privileges by that date, the hospital informed plaintiffs that they would be reconsidered for staff appointments only when the SOCH facility had been expanded — an action which was unlikely in the foreseeable future because of insufficient funds. This decision, while possibly justified as a matter of internal policy, was nonetheless a repudiation

---

[2]Testimony of Dr. Muir:

ANSWER: . . . in my interview, I had disqualified them [the plaintiffs] as being the primary surgeons at Southern Ocean County Hospital or the primary surgeon.

QUESTION: May I ask how you reached that decision?

ANSWER: It was a subjective one based on my experience and based also on the fact that I did not feel that they were dynamic enough to represent the Department of Surgery in a primary role at Southern Ocean County Hospital.

of the surgical team concept which supposedly was to serve as the basis for hiring new staff members. Furthermore, it permitted the hospital to deny plaintiffs' applications without appearing to be arbitrary. This overall pattern illustrates both confusion and inconsistency in the staffing policy at the hospital. As Dr. Muir frankly admitted, "When Southern Ocean County was originally opened they had no idea of what the staffing requirements would be." Thus, in the absence of a clearly-defined staffing program, plaintiffs' applications were subjected to varying requirements whose relationship to the needs of the hospital was never firmly established. Even if the plaintiffs failed to exhibit the dynamism which was initially required for the position of primary surgeon, their applications warranted reconsideration when the needs of the hospital and, presumably, the requirements for admission to the surgical staff were later reassessed.

Besides the staffing criteria whose application I find to be arbitrary, I am unpersuaded by the other reasons presented by the hospital to justify its denial of plaintiffs' applications.[3] Chief among these reasons was the fear that an extension of staff privileges to plaintiffs would overburden the limited facilities at SOCH and thereby reduce the quality of care afforded by the hospital. Because the record establishes that SOCH has been operating at approximately 80-90% capacity, defendants' contention, on its face, seems to have merit. However, it should be recalled that SOCH is a "satellite hospital" and, as such, is intended primarily to provide outlying regions with a facility for the treatment of urgent and emergency cases.

---

[3]It was not until February 28, 1973 that plaintiffs were informed as to the reasons for the hospital's rejection of their applications. On that date, they were notified that:

 Because of the limited bed capacity existing at the satellite hospital, it would not be in the best interest of the general public of the community serviced by Southern Ocean County Hospital, to enlarge the General Surgery staff.

Ante at 350–351. At present, much of the surgery which is performed at the facility is elective in nature and could, if necessary, be reassigned to the sponsor hospital in order to guarantee sufficient space at SOCH for emergency cases. Consequently, with respect to its nonelective surgical cases, SOCH is operating at less than full capacity. Furthermore, there is little danger that the facility would become overburdened if plaintiffs were accorded staff privileges. As the trial court found, the number of physicians in the service area who are admitted to practice at SOCH would not increase the number of patients defined as emergent or urgent cases since the number of such cases is "caused by physiological factors . . . totally unrelated to the number of doctors." Moreover, the hospital administrator, the admissions director or another hospital officer could oversee admissions and assure that the practice of admitting urgent and emergent cases is not abused. In any event, it is unlikely that the projected 4-5 operations per week which plaintiffs would perform at the hospital will compromise its high quality of medical care or severely tax its facilities. This is consistent with the court's finding in *Davis v. Morristown Memorial Hosp., supra,* that "Surgical beds in a hospital may be controlled, except for emergencies, and *a surgical department operated at figures in excess of 90% occupancy.*" [106 *N. J. Super.* at 45; emphasis supplied].

In conjunction with these considerations, I also find that the alleged inability of the hospital to control patient admissions is incredible. I find no reasonable basis for defendants' rejection of the suggestion that a "gatekeeper" be employed to screen incoming cases in order to assure that urgent or emergent cases receive preference. The force of defendants' contention is further undermined by the hospital's continued admission of other physicians to its general staff. The logical result of this action is to increase use of hospital facilities, including those in its surgical department. This would seem to place the hospital well on the road towards the overburdening which it seeks to

avoid. The apparent arbitrariness of this action is not mitigated by the fact that staff privileges have been limited to nonsurgeons. There is a clear and substantial relationship between a patient's choice of hospital and the facilities at which his personal physician has staff privileges. The continued appointment of doctors to the staff of SOCH can only exacerbate the alleged problem of overburden. This is particularly so where the hospital is the only medical facility in a relatively isolated area. In light of the privileges which continue to be granted, I remain unconvinced that positions cannot be found somewhere on the staff at the satellite hospital for these plaintiffs.

The failure to grant staff privileges to plaintiffs will, of course, effectively preclude their respective practices in the Long Beach Island area. This result contravenes one of the principal purposes of establishing satellite hospitals — to induce physicians to move to areas which lack sufficient medical services. Furthermore, as the majority readily acknowledges, surgeons are peculiarly dependent upon accessible hospital facilities in order to practice their profession. Ante at 355. Plaintiffs' need is not diminished by the fact that they have obtained staff privileges at other hospitals. In *Davis v. Morristown Memorial Hosp., supra,* 106 *N. J. Super.* 33, the plaintiff-obstetricians sought staff privileges at defendant-hospital after the obstetrical department in a nearby hospital at which they had such privileges was closed. Their applications to the defendant were denied and plaintiffs brought an action to compel their admission. Although the Chancery Division ultimately denied their request, the basis for the court's decision was defendant's demonstration of a genuine overcrowding problem and not the fact that plaintiffs had staff privileges at three other hospitals. In this regard, the court stated:

Plaintiffs, I find, are faced with a very real professional problem. They will lose those obstetrical patients who desire to be delivered at Morristown hospital, because they have no obstetrical privileges at defendant hospital, and All Souls' obstetrical department is

closed. I find there will be loss of patients, based upon the testimony before me. Nor will they be available at their Morristown office to care for patients looking for a qualified obstetrician in Morristown, but also desiring to be delivered at a Morristown hospital. To this extent, "service to the public" is impaired. [106 *N. J. Super.* at 47]

As indicated by the court's statement, the granting of staff privileges is inextricably related to the interests of a physician's patients and the public at large. Such interests are natural concomitants of the public duty with which hospitals are entrusted. Because a patient's desire to be treated by his personal physician is affected by a hospital's staffing decision, it imposes a limitation on the discretion which the hospital may exercise. As this Court observed in *Greisman, supra*:

It hardly suffices to say that the patient could enter the hospital under the care of a member of the existing staff, for his personal physician would have no opportunity of participating in his treatment; nor does it suffice to say that there are other hospitals outside the metropolitan Vineland area, for they may be too distant or unsuitable to his needs and desires. All this indicates very pointedly that, while the managing officials may have discretionary powers in the selection of the medical staff, those powers are deeply imbedded in public aspects, and are rightly viewed . . . as fiduciary powers to be exercised reasonably and for the public good. [40 *N. J.* at 402]

Somewhere between the shuffle of the cards and the dealing of the hand, today's majority has lost sight of this essential public interest. It has instead elevated the discretion of the hospital in a manner which I find totally inconsistent with our earlier decisions in this area of the law. I am aware of the extreme demands which are often placed on medical facilities to provide health services commensurate with the needs of the community which they serve. Nonetheless, on the record before us, it is not so clear that defendants cannot accommodate the interests of the plaintiffs and their patients and still satisfy their own

professional obligations. Therefore, I must respectfully dissent.

*For reversal*—Chief Justice HUGHES, Justices MOUNTAIN, SULLIVAN, CLIFFORD and SCHREIBER and Judge CONFORD—6.

*Dissenting*—Justice PASHMAN—1.