106 N.J. Super. 33 (1969)
254 A.2d 125
ROBERT E. DAVIS, M.D., AND A. BRUCE MUNRO, M.D., PLAINTIFFS,
v.
MORRISTOWN MEMORIAL HOSPITAL, A NON-PROFIT CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided June 5, 1969.
*34 Messrs. Wharton, Stewart & Davis, attorneys for plaintiffs (Mr. Richard H. Thiele, Jr., of counsel).
*35 Messrs. Schenck, Price, Smith & King, attorneys for defendant (Mr. Clifford W. Starrett, of counsel).
WAUGH, A.J.S.C.
Plaintiffs Robert E. Davis, M.D., and A. Bruce Munro, M.D., two qualified, Board-certified obstetricians, practice obstetrics and gynecology in two offices, one located in Morristown, the other at Denville, in this County.
It is uncontroverted that Dr. Davis commenced practice in Morristown in 1955, and was joined by Dr. Munro in 1962. Shortly after establishing his practice in Morristown, Dr. Davis opened an office in Denville. Plaintiffs now practice in both locations, limiting their practice to obstetrics and gynecology.
Until the closing of the obstetrical department at All Souls' Hospital, Morristown, in 1968, plaintiffs were on the staffs of three hospitals  namely, All Souls', Morristown; St. Clare's, Denville; and Riverside, Boonton.
Plaintiffs, impressive in demeanor and attitude on the witness stand, and obviously qualified professionally, have built a highly successful practice, reaching 450 deliveries in 1967, with 80% of these deliveries at St. Clare's Hospital, Denville, and 20% at All Souls' Hospital, Morristown. Actual figures given on Ex. P-52 show 349 at St. Clare's, 80 at All Souls' and, apparently, 20 at Riverside Hospital.
It is established by the testimony that the office practice of plaintiffs in Morristown is more extensive to the extent that they see more obstetrical patients at the Morristown office than they delivered at All Souls' Hospital. Approximately two-thirds of their Morristown office patients were delivered at All Souls', while the other third was delivered at St. Clare's Hospital. The reason for this situation is that some women patients prefer appointments in Morristown for convenience, but it is also a fact that plaintiffs have arranged and urged their patients, where possible, to deliver at St. Clare's Hospital. In fact, one of their arguments for admission *36 to the staff of defendant is their ability to ease the overcrowding at Morristown Hospital by shifting patients from the Morristown area to the other hospitals at which they practice.
I am not unmindful that this shifting of patients to St. Clare's may have been due, in part, to plaintiffs' preference for St. Clare's. One interesting sidelight of the case is the dwindling number of births at All Souls' (i.e., 474 in 1965, 366 in 1966, 274 in 1967). All Souls' was about to close its obstetrical department, and it is a fair inference in the case that small obstetrical departments present personnel and other problems which doctors prefer to avoid. In fact, some of the evidence gave 2,000 births per year as a satisfactory figure for the operation of an obstetrical department.
The unique situation at All Souls' led to its closing its obstetrical department in 1968. As soon as that closing became imminent, plaintiffs applied to defendant Morristown Memorial Hospital for obstetrical staff privileges, each stating by letter of application:
"I am well aware of the surgical bed problem at Morristown Memorial and therefore wish to take this opportunity to state for the record, that I have no intention of doing any private gynecological procedures anyplace other than at the hospitals where I am presently practicing. I consider D&C's, threatened abortions, incomplete abortions and ectopics to be GYN cases and will take them to All Souls' for surgical care.
These Morristown maternity patients represent approximately 20% of our present practice and I don't intend to change that ratio.
Dr. Munro[*] and I delivered 77 patients at All Souls' in 1967 and we do not intend to do any more than that in Morristown this year or in the future."
They were refused admission on the basis of a policy of the defendant Hospital set forth in A.M. No. 550, which states: *37 "Please make sure that all physicians who express an interest in applying for an appointment to our Medical Staff are apprised of the following policies as revised at recent[**] meetings of the Committee of Managers:
Until an adequate number of medical-surgical, OBS-GYN, and psychiatric beds can be provided, doctors who newly apply for appointment to the Medical staff and would be admitting patients to any of these beds will be informed that action on their applications must be deferred, except for such doctors as may qualify under one or more of the following criteria:
1. Is setting up practice in a community that is within the hospital primary service area and urgently needs such a physician.
2. Provides specialized professional skills that will substantially improve a service of the hospital.
3. Requests, and qualifies for, a temporary appointment."
It should be noted that this policy, while it became effective as to OBS-GYN March 27, 1968, was effective as to medical-surgical admissions as of October 15, 1967 and psychiatric as of January 3, 1968. It is this policy  and the reasonableness of this policy  that is here in issue.
In an effort to have all the issues decided completely and expeditiously, the court suggested and counsel cooperated by having the issue of the doctors' qualifications reached in advance of trial. They were found to be qualified for appointment to the staff. The only bar to admission is A.M. No. 550. This is set forth in the pretrial order in the following language:
"2. Plaintiffs stipulate in accordance with their application for staff privileges at Morristown Memorial Hospital, that they will agree to limit their deliveries to not more than 20 per cent of their total practice, approximately 100 deliveries per year or such lesser number as the Court may deem reasonable.
The parties stipulate that the application of the two plaintiffs have been acted upon affirmatively by the proper committees of the defendant-hospital in accordance with all procedures, leaving the only bar to their admission the policy statement of March 27, 1968, closing the obstetrical-gynecological staff at defendant-hospital to further appointments."
*38 Morristown Memorial Hospital is a hospital of high reputation, organized in 1892 as a private nonprofit corporation. It has grown from 152 beds in 1952 and has since relocated in a new building containing 382 beds. Its capital funds are derived from individual and corporate gifts; also from bequests. It has received modest sums under the Hill Burton Act, 42 U.S.C.A. § 291 et seq., and from Public Health Service. Operating funds derive from patient fees, United Fund contributions and payments by governmental bodies and agencies for indigent and other special categories of patients. Factually, defendant hospital receives funds from the same sources as did Newcomb Hospital.
In Greisman v. Newcomb Hospital, 40 N.J. 389 (1963), affirming 76 N.J. Super. 149 (Law Div. 1962), our Supreme Court declared that hospitals such as Morristown Memorial Hospital here "are private in the sense that they are non-governmental but they are hardly private in other senses." (at p. 396) In that case the court, at pp. 395-399, completely disposes of the public-private argument advanced by defendant here. I find the argument to be without merit.
The administrative powers of the corporation are vested in a board of trustees, who have charge, control and management of the property, affairs and funds of that corporation. The trustees elect a committee of managers which acts as an executive committee for the board of trustees.
After trial, and immediately before final argument, defendant hospital moved to reopen its case to show that plaintiffs, in 1969, had advertised in a newsletter of the American College of Obstetricians and Gynecologists:
"A Board-certified or eligible ob-gyn man, married with military obligations completed is wanted to join an active two-man partnership. Salary leading to partnership. Contact: Robert E. Davis, M.D. or A. Bruce Munro, M.D., 60 Broadway, Denville, New Jersey. Phone XXX-XXX-XXXX."
It was defendant's contention that the ad showed clearly there was no economic loss to plaintiffs.
*39 I did permit reopening. Plaintiffs frankly concede they desire another associate and future partner. They stress the need to keep current with good medical practice by frequent attendance at medical conventions and the need for vacation and relaxation; as they put it, "in a two man practice if one is out, you again are a lone practitioner." Plaintiffs concede also that their Morristown practice is still alive despite the closing of All Souls'. They had 22 new patients in January, February and March 1969, two-thirds are multiparas and one-third new; while at their Denville office the percentages are two-thirds new patients and one-third multiparas. Plaintiffs' gynecological practice in Morristown is unaffected by this suit, since these patients may be treated by plaintiffs at All Souls'. As stated above, they do not intend to treat gynecological patients at defendant hospital even if admitted to the staff there.
This case should not turn upon the narrow question of economic loss. There is evidence in the case from the doctor experts, and a concession by Mr. Boyd, executive director of defendant, which mandates a finding that eventually plaintiffs' OB practice in Morristown will be curtailed. And while they may build a successful practice in the municipality in gynecology or may successfully transfer their practice totally to Denville, nevertheless, the other questions are "substantial enough," as they affect plaintiffs' professional status, "to warrant at least * * * judicial examination" of the validity of A.M. #550. See Higgins v. American Society of Clinical Pathologists, 51 N.J. 191 (1968), at pp. 201, 202.

LAW
The field of law involving hospital staff admissions has been the subject matter of a substantial volume of case law, and of law review articles. New Jersey courts have been in the forefront in the field. They have generally taken an advanced position, reviewing staff admissions to make certain *40 that hospital officials exercise "their powers in trust" in a lawful manner.
In Falcone v. Middlesex County Medical Society, 34 N.J. 582 (1961), affirming 62 N.J. Super. 184 (Law Div. 1960), Justice Jacobs noted (at pp. 590-596) the reluctance of courts "to interfere with the internal affairs of membership associations * * *,"; but after tracing many New Jersey and out-of-state cases, concludes:
"* * * in a case presenting sufficiently compelling factual and policy considerations, judicial relief will be available to compel admission to membership;" (at p. 596),
and with respect to the power lodged in defendant Medical Society said:
"Public policy strongely dictates that this power should not be unbridled but should be viewed judicially as a fiduciary power to be exercised in reasonable and lawful manner for the advancement of the interests of the medical profession and the public generally; the evidence firmly displays that here it was not so exercised and that Dr. Falcone was fairly and justly entitled to the relief awarded to him in the Law Division." (at p. 597)
And:
"* * * When the County Society engages in action which is designed to advance medical science or elevate professional standards, it should and will be sympathetically supported. When, however, as here, its action has no relation to the advancement of medical science or the elevation of professional standards but runs strongly counter to the public policy of our State and the true interests of justice, it should and will be stricken down." (at p. 598)
This case has been the subject matter of several law review articles: Note, "The Physician's Right to Hospital Staff Membership: The Public-Private Dichotomy," Wash. L.O., 485 (1966); Note, "Exclusion from Private Associations," 74 Yale L.J. 1313 (1965); Note "Expulsion and Exclusion from Hospital Practice and Organized Medical Societies," 15 Rutg. L. Rev. 327 (1961); Note, "Judicially Compelled Medical Societies: The Falcone case," 75 Harv. L. Rev. 1186 *41 (1962); Note, "Developments in the Law-Judicial Control of Actions of Private Associations," 76 Harv. L. Rev. 983 (1963).
In Greisman v. Newcomb Hospital, supra., the court reaffirms its decision in Falcone and applies it to a hospital by law, rather than to a medical society. The court held that plaintiff Dr. Greisman was entitled to have his application considered "in accordance with the hospital's valid bylaws." at (40 N.J., at p. 402.)
In Greisman the court was "not asked to pass on a discretionary exercise of judgment but only on the validity of the bylaw requirement," and held that in the light of Falcone the bylaw was invalid. Id., at p. 402. It then adds:
"Hospital officials are properly vested with large measures of managing discretion and to the extent that they exert their efforts toward the elevation of hospital standards and higher medical care, they will receive broad judicial support. But they must never lose sight of the fact that the hospitals are operated not for private ends but for the benefit of the public and that their existence is for the purpose of faithfully furnishing facilities to the members of the medical profession in aid of their service to the public. They must recognize that their powers, particularly those relating to the selection of staff members, are powers in trust which are always to be dealt with as such. While reasonable and constructive exercises of judgment should be honored, courts would indeed be remiss if they declined to intervene where, as here, the powers were invoked at the threshold to preclude an application for staff membership, not because of any lack of individual merit, but for a reason unrelated to sound hospital standards and not in furtherance of the common good." (at pp. 403-404)
In Sussman v. Overlook Hospital Ass'n, 95 N.J. Super. 418 (App. Div. 1967), affirming, 92 N.J. Super. (Ch. Div. 1966), we have an extension of the Greisman doctrine in a holding that makes it incumbent upon a hospital to formulate "necessary procedures * * * to insure a fair and thorough determination of plaintiffs' applications," including the right to appear, present documents and witnesses. (at p. 425).
It should be noted that in Greisman and Falcone the courts were concerned with matters of "public policy." Public policy *42 is determined exclusively by the Legislature. See Doremus v. Board of Education of Hawthorne, 5 N.J. 435 (1950), where the court said:
Subject to constitutional limitations, the Legislature has exclusive jurisdiction over matters of public policy, Schenley Products Co. v. Franklin Stores Co., 124 N.J. Eq. 100, 105 (E. & A. 1937); State v. Donovan, 129 N.J.L. 478, 486 (Sup. Ct. 1943) and the courts should be very sure of their ground before they restrict that legislative field." (at p. 452)
Even though no matter of public policy is here involved, I conclude from the holding in Greisman that this court has the duty to exercise "broad judicial authority to insure that exclusionary policies are lawful and are not applied arbitrarily or discriminately."
I note in passing that N.J.S.A. 30:11-1 states in part:
"It is declared to be the public policy of this State to provide for the development, establishment and enforcement of basic standards for the care and treatment of individuals in private mental hospitals, convalescent homes, private nursing homes and private hospitals as defined herein and for the construction, maintenance and operation of such institutions in such a manner as to insure safe and adequate treatment of all such individuals in said private mental hospitals, convalescent homes, private nursing homes and private hospitals."
and it may be that the Department of Institutions and Agencies may in the future as a matter of public policy determine that geographical limitation of patients, multiple staff appointments and orders for increasing bed capacity are of sufficient concern to issue directives in this field. Presently they have not done so.
In the present case, then, we appear to reach, for the first time in New Jersey, the question of discretionary exercise of judgment by a hospital board in closing staff appointments.
A case similar to this, Schneir v. Englewood Hospital Association, 91 N.J. Super. 527 (Law Div. 1966), in that, factually, it appeared to turn upon a bed shortage, as does this, has been called to the court's attention, but it is not otherwise helpful.
*43 The test to be applied in determining the validity of the hospital's action in adopting A.M. # 550 is its reasonableness as it relates to "sound hospital standards" in "faithfully furnishing facilities to the members of the medical profession in aid of their service to the public." Our courts speak in terms of "constructive exercise of judgment" and discretionary powers "in trust."
Plaintiffs raise the question whether or not they, or persons similarly situated, should not have been permitted to introduce facts to the committee of managers prior to the adoption of A.M. # 550. I conclude from Sussman, supra, where the court said:
"We agree that the necessary procedures should be formulated by defendant in order to insure a fair and thorough determination of plaintiffs' applications. As Judge Mintz stated: `Such procedure should provide for the applicant to appear in person if he so desires and present witnesses and appropriate documents.' At the same time, the inquiry should not be equated to that of a trial-type hearing. A board of trustees of a hospital does not have the power to subpoena witnesses or administer oaths. All that is required is for the board to be fully informed so that it may make an intelligent and reasonable judgment in good faith upon all the facts presented." (at p. 425)
that the last sentence of the quoted section is the guideline.
It is not, however, too early to remind hospital boards that since their actions may come under judicial review, the court must know what information they acted upon. In Reinauer Realty Corp. v. Paramus, 34 N.J. 406 (1961), Justice Francis said:
"It must be kept in mind that zoning and Boards of Adjustment are presently integral aspects of our community life. Decisions assigned to such boards by the Legislature and by local ordinances must be made with a formality of procedure that will satisfy the needs of the various interests involved. The boards must realize that their action on special use exceptions, variances, and the like, in any case may ultimately reach a court for review. The judicial decision can be based only on the evidence, testimony, exhibits and the factual findings which led to the result under attack. So if a proper record is not put together and presented by the board to the governing body and later *44 handed to the court, the judiciary cannot fulfill its role in the scheme of government. In an effort to coordinate and integrate the efforts of all agencies concerned, a further suggestion is ventured. When applications of the type involved here are presented to a local board, its members should remind themselves that a stranger to the proceedings, completely uninformed of the local conditions and of the facts of the particular problem, may be called upon to review the ultimate decision. And they should ask themselves: how can we put the problem presented to us, the facts on which we are asked to act, the decision reached by us, and the reasons (the specific factual findings) which led us to the decision, into such a documentary framework that the stranger may read and understand? Such an approach would produce the kind of understanding that is needed at all levels of treatment of these zoning problems." (at pp. 416-417)
One need only substitute "hospital boards" for "zoning and Boards of Adjustment."
Plaintiffs' attorney cites several California decisions: Blank v. Palo Alto-Stanford Hospital Center, 234 Cal. App.2d 377, 44 Cal. Rptr. 572 (Dist. Ct. App. 1965); Letsch v. Northern San Diego Hospital District, 246 Cal. App.2d 673, 55 Cal. Rptr. 118 (Ct. App. 1966), both of which upheld resolutions of hospitals closing staffs to all radiologists, excepting a single one with whom the hospital made a contract, as reasonable. In Letsch, the court used our zoning test of "unreasonable, arbitrary or capricious" in testing the hospital's action. In Blank, the court asked the rhetorical question:
"* * * It would appear that what should be the proper procedure for X-ray, pathology, and related services and departments, would be better determined in calm administrative hearings than by adversary proceedings in the courtroom." (at p. 574)
In the same vein, some law review articles question whether courts have the expertise to deal with the type of question here involved. The court, however, gave the same answer as we in New Jersey give, namely:
"* * * Where, however, the discretion inherent in the determination of such questions is abused so as to violate recognized rights, such as that to pursue a lawful calling, the courts should not hesitate to intervene."
*45 With these tests of reasonableness, let us turn to the facts.
The hospital's action in adopting A.M. # 550 can be justified only if it has an occupancy problem in its obstetrical department. A very substantial amount of trial time and testimony concerned these occupancy figures. Maternity beds present a special problem to a hospital. Surgical beds in a hospital may be controlled, except for emergencies, and a surgical department operated at figures in excess of 90% occupancy. For maternity beds, however, an occupancy figure of 70% is suggested.
Ex. D-16, Manual of Standards in Obstetric-Gynecologic Practice of the American College of Obstetricians and Gynecologists, page 6, puts it this way:
"To provide for the frequent peak activity, the annual average bed occupancy should not exceed 70 percent. Whenever possible, the unit should be flexible enough to permit expansion and contraction of the various types of accommodations according to the needs of the moment."
Morristown Memorial Hospital reduced its number of maternity beds in 1964 to 31 from 39. According to its figures, it had a percentage of occupancy between 1964 to 1968 of over 70% in each year. After the closing of All Souls' Hospital's obstetrical department, this occupancy rate for the last eight months of 1968 exceeded 80% in every month but two.
It is true that to some extent the statistics may be manipulated, depending upon the time of daily count, and whether or not one counts an extra bed by prohibiting rooming-in, or suggests that the hospital count beds in a solarium, or in the labor room or post-partum room.
I am satisfied substantially that the hospital's figures are correct, and that they have a high percentage of occupancy in comparison to other hospitals.
Most important, however, is the concession of plaintiffs' renowned expert, Dr. Alan F. Guttmacher, whose testimony, as I understand it, is that the 70% occupancy rule is not *46 "ironclad." He believes 80% is "O.K." but that 85% is too much. That "occupancy is at 85% regularly would cause me concern." Dr. Guttmacher also conceded that the use of four beds in a solarium, urged by plaintiffs, was "not preferable."
Plaintiffs' counsel, in his brief, while not conceding completely on the occupancy issue, does say in part:
"Yet, on the basis of the testimony adduced, it is at least arguable as Dr. Guttmacher stated that an occupancy rate consistently in excess of 80% is something a hospital might consider doing something about. In fact, both Dr. Guttmacher and Dr. Clark, men of long experience in hospital administration and in the administration of obstetrical departments, asserted that any obstetrical service obviously has a limit and that it is up to the particular hospital to make a determination as to what that limit ought to be. So, the hospital's judgment is accepted on the question of whether or not it has a problem in obstetrical occupancy."
I am satisfied that the hospital has followed the other good practices suggested by plaintiff's experts, Dr. Guttmacher and Dr. Clark  namely, "early induction in proper cases," and "early discharge" consistent with the health of mother and baby.
I am satisfied, factually, that defendant Morristown Hospital does have an occupancy rate problem in the OB Department.
Among other suggestions, plaintiffs urged construction of more hospital space and obstetrical beds. The brief testimony I heard on this point leads me to the conclusion that it would take defendant hospital at least five years to provide additional obstetrical beds, assuming the funds were available and defendant desired to add such beds; that obstetrical beds are not economically desirable from a hospital management and financial return viewpoint; and that according to the testimony of Mr. Edward Mooney, executive director of the Health Planning Council, Morris Memorial Hospital probably could not expand OB beds while other hospitals in the county had a low occupancy rate.
*47 Since the court has not been requested to take any action in this regard, nor would the court have power to order additional beds, I pass the point.
Plaintiffs, I find, are faced with a very real professional problem. They will lose those obstetrical patients who desire to be delivered at a Morristown hospital, because they have no obstetrical privilege at defendant hospital, and All Souls' obstetrical department is closed. I find there will be loss of patients, based upon the testimony before me. Nor will they be available at their Morristown office to care for patients looking for a qualified obstetrician in Morristown, but also desiring to be delivered at a Morristown hospital. To this extent, "service to the public" is impaired.
Further, I find that plaintiffs' Morristown office can only be sustained by gynecological patients whom they may hospitalize at All Souls,' or by obstetrical patients who, while intending to be delivered at St. Clare's or Riverside Hospitals, are willing to visit plaintiffs' Morristown office for convenience.
Plaintiffs urge that a more reasonable and less arbitrary or capricious course for defendant hospital is to limit admissions geographically and to provide multiple staff appointments. This is based on Ex. P. 46, Guidelines and Recommendations for the Planning and Use of OBSTETRICAL FACILITIES IN SOUTHERN NEW YORK, page 1, January 1966:
"3. Maternity departments should be large enough to permit at least 2,000 births annually, which would require 36 to 40 obstetrical beds per institution. Exceptions may be required in the less populous areas of the region. However, even in these areas, maternity programs should be coordinated to achieve effective use of specialized personnel and facilities. This may be accomplished by offering multiple staff appointments to all qualified obstetricians in such communities."
Plaintiffs would have Morristown Memorial Hospital lead in coordination of multiple staff appointments among all Morris County hospitals or alone start a trend to multiple staff appointments based on Ex. P-46, page 14:
*48 "* * * When one institution is experiencing peak loads and another has empty beds, a physician might arrange for his patient to be admitted to the appropriate hospital. To accomplish such coordination may require that multiple staff appointments be granted to qualified obstetricians[1] at institutions located in the same community, so that the traditional physician-patient relationship will not be disrupted. It is recognized, of course, that each hospital is responsible for determining the qualifications for individual staff members." (Emphasis added; footnote omitted)
Plaintiffs cite Ex. P-63, Hospital Accreditation References, (1964 Ed.), page 42 as authority for their position that bed capacity is not a basis for denial of staff appointment. It says:
"d. A competent medical staff. Though listed fourth, the most important factor in evaluating clinical practice is a competent medical staff. The quality of medical care in the hospital is in direct ratio to the knowledge, experience, and ability of the members of the medical staff. The judgment necessary to evaluate clinical practice depends entirely on the ability of those who are doing the evaluating.
This makes the appointments to the staff and the delineation of privileges especially important. To perform these functions fairly and objectively, the medical staff should set up a system to evaluate each applicant and determine his hospital privileges on the basis of professional competence. Individual character, training, experience, and ability should be the criteria for selection. Under no circumstances should accordance of staff membership or professional privileges in the hospital be dependent solely upon certification, fellowship, or membership in a specialty body or society. Neither should appointments be denied on the basis of hospital bed capacity or selfish competitive motives on the part of the staff."
Plaintiffs also urge that their admission to the Morristown Memorial Hospital staff serve a purpose of lightening the occupancy rate at that hospital because plaintiffs have successfully urged a great majority of their patients to use St. Clare's and will continue to do so. This seems borne out by their testimony, but I do not find it of sufficient importance to a decision other than to note it in passing.
Assuming an open staff at Morristown Memorial Hospital of all qualified obstetricians, including plaintiffs, the hospital would notify all staff members when the occupancy rate *49 reached an unmanageable proportion and advise them that they must take their patients to other hospitals. This solution, I find, poses several difficulties, as follows: The patient does not have the choice of a hospital. The last-minute switch to a hospital that she does not prefer may have a deleterious effect upon her health. The matter of pre-registration of mothers, a common practice at maternity hospitals, is not possible except on an inter-hospital cooperation basis.
There was testimony pro and con respecting the shifting of mothers to another hospital, depending on occupancy rate at the time. I conclude that common sense preponderates in favor of not shifting, once a prospective mother has chosen a hospital. "Service to the public" is one of the criteria of our cases. There is no suggestion that the Department of Institutions and Agencies of this State, which exercises a measure of control over hospitals, has urged open staffs, geographical limitations, and shifting patients. Such controls may become necessary, but until they do, courts should be reluctant to order such measures.
Doctors specializing in obstetrics would be required to be on the staffs of several hospitals, so that if one hospital were crowded, he could deliver his patient at another. This solution presupposes that the other hospitals in the Morristown area would admit those doctors practicing at Morristown Memorial Hospital. Members of the staff at Morristown Memorial Hospital, with one exception, do not have privileges at the other three hospitals in Morris County. All but two are sole practitioners.
There was testimony that obstetricians may conveniently practice at more than one hospital. In fact, Dr. Guttmacher regularly did so. I am persuaded, however, by the testimony of Dr. Margaret Doyle, a member of the OB staff of Morristown Memorial Hospital, that practice by a single practitioner at two hospitals presents dangers to patient care in that two patients may be in labor at two hospitals some eight miles apart; that the difference in hospital facilities or staff cooperation could represent a danger to the patient. Obstetricians *50 tend to work with certain pediatricians or other specialists in one hospital. Thus, it would be essential for staffs to be open not only to OBS, but to every other specialty.
Plaintiffs' suggested alternative of a geographical limitation on obstetrical admissions by Morristown Memorial Hospital requires a discussion of the facts involved in those obstetrical admissions. Plaintiffs would have the court find that a more reasonable solution to the hospital's problem is for it to declare and fix a geographical limitation on obstetrical admissions. The geographical limitation suggested is most graphically shown on a large map (marked only D-14 for identification, but used by the court, with consent). This exhibit notes areas as follows, based upon 1800 births at the hospital:

 No. of Births Percentage
Primary and secondary area 1533 85.2
Peripheral area 157 8.7
Remote 110 6.1

It is true, as plaintiffs urge, that Mr. Boyd, the hospital's administrator, in his letter to Commissioner McCorkle of State Department of Institutions and Agencies gives credence to plaintiffs' contention that the hospital does have a primary area of service obstetrically in the southern part of Morris County. However, the figures in evidence and the hypothetical question indicate a substantial number of obstetrical patients are from beyond the primary area of the hospital's service, and under plaintiffs' plan they would be excluded from Morristown Memorial Hospital.
In the absence of any policy instituted by the Department of Institutions and Agencies, I conclude that there is no legal basis upon which a court in this State may directly or indirectly fix geographical limitations for admission of hospital patients to a private hospital such as defendant hospital.
It is apparent to the court that the passage of A.M. # 550 is financially beneficial to the present members of the obstetrical *51 staff at defendant hospital. It is true, too, that an examination of the OB-GYN department's minutes indicates no profound grasp of the hospital's problems, or future development, and does evidence a rather parochial viewpoint. Dr. Doyle was the only member of the staff to testify, and I was impressed with her candor and her testimony on multiple hospital practices.
Nor do I find from the evidence that Mr. Boyd served only the interest of the OB-GYN staff. As administrator faced with a problem  namely, an occupancy rate in OB-GYN that should cause "concern" (admittedly)  he was under a duty to marshall the facts, inclusive of a determination of the intentions of present staff members. His letter to Commissioner McCorkle says, in part:
"Briefly summarized, we must conclude that, for the reasons cited above, we could accommodate OBS patients who would otherwise be going to All Souls' Hospital only to the extent that they would come to us through obstetricians who are already members of our staff. In planning to do so, however, we recognize that we may occasionally inconvenience our maternity patients by denying them single occupancy of a 2-bed room (of which we have 15). It is also possible that the additional patients may cause excessive occupancy of our OBS-GYN Department."
This letter certainly can be misread to say "We can take all the babies we can get, but no more doctors." It also may be read in conjunction with the statistics on page 2 of the same letter to indicate that Mr. Boyd believes that these are the patients who would normally come to Morristown Memorial Hospital. One cannot read into this letter fairly an attempt to get other doctors' patients for the staff of Morristown Memorial Hospital. In fact, we do not know whose patients they were. Mr. Boyd may be said to be an austere witness, but I found him honest.
It is true that at one point he did suggest that patients follow doctors. But he receded from that position and admitted that patients do like to go to the nearest well-conducted hospital and that plaintiffs will find it difficult to practice *52 obstetrics in a community in which they do not have an obstetrical hospital appointment. He frankly conceded that the hospital's choice of closing the staff was a difficult one to make.
I understand the reasons for plaintiffs' questioning the motivation for A.M. # 550. In analogous situations, testing the reasonableness of a zoning ordinance, our Appellate Division put it this way:
"* * * Reasonableness is a two-sided coin. On one side is the adverse impact of the restriction upon him who asserts its unreasonableness. On the other are the social and policy considerations which led to the adoption of the regulation. The final assessment of reasonableness involves a balancing of the considerations on one side of the coin as against those on the other. The more cogent the social pressures impelling the adoption of the restriction the greater the permissible abrasion of the interests of the individual affected. The testimony in question went to the manifold considerations authorized by the zoning statute which inspired the particular restriction here attacked. While it has been held that an inquiry into legislative motivation will not be permitted in order to impugn the reasonableness of legislation valid on its face, 5 McQuillin, Municipal Corporations (3rd ed. 1949), § 16.90 p. 323; Sunny Slope Water Co. v. City of Pasadena, 1 Cal.2d 87, 33 P.2d 672, 677 (Sup. Ct. 1934), yet courts will consider evidence with respect to the purpose, object, reason, necessity and effect of an ordinance where the factors bearing upon its reasonableness are not manifest on its face." (Citing cases) Clary v. Eatontown, 41 N.J. Super. 47, 71 (1956)
And yet, in using this analogy to our zoning cases, I think we must keep always in mind the admonition of Justice Jacobs in Greisman v. Newcomb Hospital, supra:
"Hospital officials are properly vested with large measures of managing discretion and to the extent that they exert their efforts toward the elevation of hospital standards and higher medical care, they will receive broad judicial support. * * *" (40 N.J., at pp. 403-404)
Also, another admonition in zoning cases by Justice Jacobs in Ward v. Scott, 16 N.J. 16 (1954):
*53 "* * * And their determinations should not be approached with a general feeling of suspicion, for as Justice Holmes has properly admonished: `Universal distrust creates universal incompetence.' Graham v. United States, 231 U.S. 474, 480, 34 S.Ct. 148, 151, 58 L.Ed. 319, 324 (1913)." (at p. 23)
As I say, one may question the wisdom and even the motives of the OB staff. Their view was considered, but other factors were fully considered by the administration in adopting A.M. # 550. I find that the administration acted from honest motives.
I find that Mr. Boyd, the hospital administrator, not only requested reports from the department of obstetrics, Dr. Letourneau and Mr. Sweetland, a hospital consultant, but also collected statistical information concerning the potential patient load diverted from All Souls' to the Morristown Memorial Hospital. All this information is in evidence. All was submitted to the joint conference committee and to the committee of managers on March 27, 1968. The managers determined to defer obstetrical appointments, including plaintiffs'. The managers approved Mr. Boyd's reply to Commissioner McCorkle, dated March 28, 1968.
Plaintiffs urge that A.M. # 550 was "a response to these judicial pronouncements (Falcone, Greisman, and Sussman) rather than, as the hospital urges, a reaction to the bed shortage problem." They urge that "by coincidence or otherwise," the hospital, through the device of A.M. # 550, may reject staff members without assigning any particular reasons, thus circumventing the cases cited.
The answer to this, in the court's view, is that the hospital has already conceded that plaintiffs are fully qualified; Mr. Boyd forthrightly testified, and I believe him, that he would "recommend the end of the policy [closing the staff] as soon as possible."
It would appear to the court that when more obstetrical beds become available, or the percentage of occupancy is reduced to manageable proportions, or there are staff vacancies for any reason, that failure to admit physicians *54 on the qualified list in order would steer the hospital into a collision course with the court.
I come to the conclusion that the hospital's action in adopting A.M. # 550 should be sustained by the court. In view of the nature of the dispute, and of plaintiffs' right to contest the policy, no costs are allowed.
NOTES
[*] In the case of Dr. Munro's application, the name inserted at this point was "Dr. Davis."
[**] Our Managers took these actions on the following dates: "Medical-surgical  10-15-67 OBS-GYN  3-27-68 Psychiatric  1-3-68"