145 N.J. Super. 393 (1976)
367 A.2d 1204
ROBERT S. WALSKY AND STANLEY I. HARRIS, PLAINTIFFS,
v.
THE PASCACK VALLEY HOSPITAL, A NON-PROFIT CORPORATION OF THE STATE OF NEW JERSEY; WILLIAM N. BURKE, CHAIRMAN OF THE MEDICAL EXECUTIVE COMMITTEE AND CHAIRMAN OF THE JOINT CONFERENCE COMMITTEE OF PASCACK VALLEY HOSPITAL; PAUL A. POSSICK, CHAIRMAN OF THE CREDENTIALS COMMITTEE OF PASCACK VALLEY HOSPITAL; AND ALBERT J. ZORETIC, DIRECTOR OF THE DIVISION OF SURGERY OF PASCACK HOSPITAL, DEFENDANTS. DR. LEONARD DI GIOVANNI, PLAINTIFF,
v.
PASCACK VALLEY HOSPITAL, DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided November 18, 1976.
*395 Mr. Vincent P. Rigolosi for plaintiffs Robert S. Walsky and Dr. Stanley I. Harris (Messrs. Picinich & Rigolosi, attorneys).
Mr. Charles F. Sheeler for plaintiff Dr. Leonard DiGiovanni (Messrs. Hoger & Sheeler, attorneys).
Messrs. Richard G. Kroner and Lawrence D. Smith, for defendants.
GELMAN, J.S.C.
These are consolidated actions brought by physicians who seek admission to the medical staff of defendant Pascack Valley Hospital (PVH). Plaintiffs' applications were denied because PVH has in effect a policy, commonly referred to as the moratorium, which prohibits further appointments to its medical staff unless the applicant meets certain conditions which will be described hereafter.
There is little if any dispute as to the essential facts which give rise to this controversy. PVH is located in Westwood, New Jersey, and is a private, nonprofit corporation which operates a general hospital facility serving 20 communities in the northeast quadrant of Bergen County.[1] PVH opened its doors in June 1959 with a capacity of 86 beds. A pediatric wing was added in 1964, increasing the bed complement to *396 110, which was further expanded in 1967 to 199 beds, and to 202 beds shortly thereafter. Following the enactment of the Health Care Facilities Planning Act of 1971, N.J.S.A. 26:2H-1 et seq., PVH made application for and was granted a certificate of need to increase its bed capacity to 242.[2] This most recent expansion was completed and the additional beds were in use by July 1, 1975. As presently organized, the hospital has 191 medical-surgical beds, 18 obstetrical beds, 24 pediatric beds, and 9 beds in the intensive-coronary care unit.
As of 1969, PVH had 151 medical-surgical beds in operation, and for that year and 1970 these beds had a utilization factor in excess of 96%. In 1970 the active medical staff, which then comprised 137 members, "importuned the Board of Trustees to impose a moratorium on new medical staff appointments because of their inability to hospitalize their patients when necessary." The board of trustees received a report from PVH's administrator, Mr. Verrastro, in which he noted that the occupancy rate for medical-surgical beds was substantially in excess of that recommended by the New Jersey Health Care Facilities Council and the United States Public Health Service (85-90%), and that the continued over-utilization of beds "would be dangerous to the safety and welfare of our patients" because of a "tendency to discharge patients earlier than warranted."[3] Verrastro recommended *397 that the board adopt measures restricting new admissions to the medical staff.
On November 24, 1970 the board of trustees adopted the resolution which is the basis of this controversy. The full text of the resolution is as follows:
The Board of Trustees having received a recommendation from the Medical Executive Committee, that it consider a limited moratorium on additional appointments to the staff:
The Board of Trustees has studied the staffing of the several departments and the effect of such moratorium on 
1. The public within the geographical area serviced by the hospital.
2. The quality of hospital care to be rendered to the community within the area served by the hospital.
3. The interest of the medical profession, both those physicians who are presently staff members and those who might wish to become affiliated with the hospital.
4. The patient load that can be serviced, utilizing the beds assignable to the various departments.
5. The economic implications to the hospital and the physicians presently on the Medical Staff, as well as those physicians who would be excluded from staff appointments.
We have concluded there is the necessity for a moratorium, therefore, it is hereby
RESOLVED, that no appointments of new applicants to the Medical Staff shall be made until July 31, 1971, excepting where limited subspecialties are needed in this hospital or where an applicant has no hospital affiliation to take care of his patients. The situation will be re-evaluated from time to time; as to the effect on the public, availability of beds, the percentage of occupancy, or staffing vacancies.
The moratorium resolution was renewed by the Board of Trustees from year to year and has continued in effect to the present date. Each new applicant for admission to the medical staff of PVH is required to sign a statement which must accompany his application acknowledging that he has read and understands the moratorium resolution, and must further agree that "if appointed to the medical staff I * * * will not seek or accept appointment to any other hospital medical staff." While the moratorium resolution, does not, by its terms, contain any restriction on an applicant's seeking admission to the medical staff of a hospital after appointment *398 to the staff of PVH, the trial testimony established that this has been the practice and procedure of PVH in carrying out the terms of the moratorium.
Following the enactment of the moratorium, PVH continued to experience excessive rates of utilization of its medical-surgical beds. For 1971 the percentage of occupancy of beds in this category was 98.8%; for 1972, 97.6%; for 1973, 99.5%; for 1974, 99.8%, and for 1975, 100%. For the first five months of 1976 the rate was 97.7%. Thus, neither the adoption of the moratorium nor the increase in the number of beds has had any impact on the occupancy problem which the moratorium was designed to alleviate.
As previously noted, in 1972 PVH made application to the Health Care Facilities Council for a certificate of need to expand the hospital bed capacity by the addition of 40 medical-surgical beds. In a statement accompanying that application the hospital made reference to the adoption of the moratorium in 1970 and went on to state as a reason for its desired expansion:
In addition to newly trained physicians attempting to establish in our area, there are a considerable number of Osteopathic Physicians practicing in the hospital service area, many of whom have asked for staff membership. The lack of adequate beds is, therefore, an impediment to the growth of the medical staff, but more important, it is a denial to many of the citizens in the hospital service area [of] the right to be hospitalized in their own community.
Since the adoption of the moratorium 67 physicians have been admitted to the medical staff of PVH, of whom 17 are described as consultants without admitting privileges. PVH asserts that all of these staff appointments have been made pursuant to the exceptions set forth in the moratorium, i.e., the applicant had a limited sub-specialty needed by the hospital or had no other hospital affiliation to care for his patients. During the same period 17 physicians, including plaintiffs in this action, have been denied admission to the staff either because they did not have any limited sub-specialty needed by PVH or because they had admitting *399 privileges at other hospitals. At the present time the active medical staff of PVH has 143 members and there are 26 consultants. So far as appears from the record in this case, the board of trustees has no intention of removing the moratorium unless and until the bed occupancy rate undergoes a significant decline.
Plaintiff Robert Walsky is a doctor of medicine specializing in general surgery, and on April 10, 1975 he applied for admission to the staff of PVH. At or about that time he formed an association for the practice of medicine with plaintiff, Stanley Harris, who also specializes in surgery. Their office is located in Park Ridge, New Jersey, within a few miles of PVH. Dr. Harris is a member of the staff of Riverdell Hospital located in Oradell, New Jersey, and he is also a staff member of PVH.
Dr. Walsky's application to PVH did not list any other hospital affiliation. However, in executing the moratorium statement appended to the application he struck from it the affirmation that he would not seek or accept appointment to any other hospital medical staff. He made known his intention to seek admission to the staff of Riverdell Hospital, with which Dr. Harris is also affiliated, so that he and Dr. Harris could treat each other's patients. As he testified at the trial, unless such were the case their purpose in establishing an association would be frustrated.
The procedure for the processing of applications for admission to the medical staff at PVH is as follows: the application is reviewed by the Credentials Committee which examines the applicant's qualifications and forwards its recommendation (together with that of the director of the division to which he seeks admittance) to the Medical Executive Committee (MEC). The MEC reviews the recommendation and in turn makes its own recommendation to the Joint Conference Committee (comprised of members of the medical staff and the board of trustees) and thence to the board of trustees. If the MEC rejects an applicant, he has the right to appeal to an ad hoc committee of the medical staff, which *400 conducts a hearing and reports to the MEC. If the decision of the MEC is still adverse to the applicant, he has the right to an appellate review of its decision by the board of trustees.
On July 8, 1975, Dr. Walsky was informed by letter that his application had been denied by the MEC because of his failure "to acknowledge the requirements of the hospital's moratorium." He immediately advised PVH of his desire to appeal the decision of the MEC based on a claim that he had a limited sub-specialty (training in certain specialized surgical procedures) needed by PVH. A hearing on his appeal was held on August 26, 1975 before an ad hoc committee of the medical staff. At the hearing it was acknowledged that Dr. Walsky was qualified by his training and experience for admission to the staff of PVH as a general surgeon.[4] Dr. Walsky reviewed the specialized procedures in which he had been trained, and after considerable discussion as to the manner in which the moratorium had been applied in the past, the committee recommended that Dr. Walsky's application be considered favorably by the MEC, "provided he can demonstrate to the Director of the Division of Surgery and the Medical Executive Committee that he has an expertise and capabilities to offer the hospital medical staff."
On September 2, 1975 the MEC met and the then Director of the Division of Surgery recommended to the MEC that in view of Dr. Walsky's "additional qualifications," he be appointed to the medical staff. This recommendation was approved and forwarded to the Joint Conference Committee, which met on September 18, 1975. Action on the application was tabled by that Committee pending reference *401 of the matter to PVH's attorney and the board of trustees "as it relates to the moratorium".
At this point the picture of what occurred in the processing of Dr. Walsky's application becomes somewhat muddled. On September 23, 1975, the executive committee of the board of Trustees met and decided to obtain a report from PVH's attorney. By letter dated October 29, 1975 counsel for PVH reported that the appointment of Dr. Walsky to the medical staff would not violate the terms of the moratorium since the latter permitted "the appointment of doctors with specialties advantageous to the hospital." In the meantime, however, the Joint Conference Committee met on October 20, 1975, and its minutes recite that the MEC had unanimously agreed that the qualifications submitted by Dr. Walsky "cannot be considered special skills needed" by PVH, and the Joint Conference Committee therefore recommended to the board of trustees the denial of his application. However, it would appear from the record that the MEC did not meet to act on Dr. Walsky's application until November 4, 1975, at which time it recommended that the application be denied because of the moratorium. This represented a reversal of its action of September 18, 1975, although the minutes of the meeting are silent as to reasons for having done so.
The executive committee of the board denied the application on November 25, 1975. Dr. Walsky requested appellate review of this action, and a hearing on that request was held on January 16, 1976, before an ad hoc committee of the board with Dr. Walsky and his attorney present. On February 12, 1976 the application was denied, and this denial was confirmed by the executive committee of the board on February 24, 1976. Dr. Walsky commenced this action on June 14, 1976, and pursuant to an interlocutory order entered in the action, he has been permitted to attend to Dr. Harris' patients at PVH pending a final hearing.
Dr. Leonard DiGiovanni is a doctor of osteopathy and has been licensed to practice medicine in this State since *402 1964. He practices family medicine, and his office is located in Northvale, within a few miles of PVH. Dr. DiGiovanni is physician to the Northvale Board of Education and also is the police surgeon in that community. He has been a member of the medical staff of Riverdell Hospital since 1964. He had sought admission to the staff of PVH ten years ago but was never advised that any action was taken on his application, and he did not press the matter at that time. He reapplied to PVH on April 13, 1976, and his application listed his Riverdell Hospital affiliation. On May 7, 1976 he was advised by Verrastro that his application could not be accepted for processing because of the moratorium. Dr. DiGiovanni filed his complaint on June 23, 1976, and by interlocutory order PVH was directed to process his application pending a plenary hearing.
Since the complaints filed by Drs. Walsky and DiGiovanni raised common questions of law and fact concerning the validity of the moratorium, the actions were consolidated for trial. See R. 4:38-1.
At the trial Dr. Walsky testified that he sought admission to the medical staff of PVH for a variety of reasons, principally because the range of facilities, services and general patient care available at PVH were superior to those at Riverdell Hospital. He estimated that 90% of the patients treated by himself and Dr. Harris reside within the communities comprising the service area of PVH and that many desire to be admitted to PVH.
Dr. DiGiovanni testified that over 80% of his patients reside in PVH's service area and that on many occasions they wished to be admitted to PVH. He also noted that the range of facilities and services at PVH were superior to those at Riverdell and would benefit his patients. Further, he pointed out that on numerous emergency calls, as the school physician and police surgeon of Northvale, he was unable to treat patients at PVH, which is the closest hospital to Northvale. He expressed the opinion that the denial of staff privileges to him by PVH was a disservice *403 to his patients and interfered with his ability to practice his profession.
Plaintiffs' challenge the validity of the moratorium on a variety of grounds. It is said that the moratorium represents an arbitrary and capricious exercise of discretion on the part of the Board of Trustees in that (1) it has not accomplished the purpose for which it was intended; i.e., a reduction in bed occupancy rate, which has increased since the moratorium has been in effect; (2) it precludes patients residing within the primary service area from being attended in PVH by physicians of their own choice; (3) it discriminates against newly admitted physicians by denying to them the right to seek other hospital affiliations, whereas physicians on the staff of PVH prior to the moratorium can both seek and maintain other such affiliations; (4) it is counter-productive in that by prohibiting physicians from seeking staff affiliations elsewhere after admission to the staff of PVH it serves to increase the bed occupancy problems at PVH; (5) it fails to establish any ascertainable standards or criteria by which physicians may be admitted to the staff under the "limited sub-specialty" exception, thereby permitting the board and the MEC to admit physicians to the staff based on mere whim or caprice; (6) it unreasonably interferes with plaintiffs' ability to treat their patients at a hospital offering facilities superior to those otherwise available to them; (7) it unreasonably interferes with plaintiffs' right to earn an economic livelihood from the practice of their profession, and finally, (8) PVH, as the recipient of funds under the Hill-Burton Act, 42 U.S.C.A. § 291 et seq., cannot deny staff privileges to any qualified physician.
Before considering plaintiffs' contentions, however, reference must be made to the scope of judicial review available in this setting. The foundation case in this State is Falcone v. Middlesex Cty. Medical Soc., 34 N.J. 582 (1961). There a licensed physician was denied membership in the Middlesex County Medical Society because he had not completed *404 four years of study at an A.M.A.-approved medical school. As a consequence of that action he lost his hospital affiliations with two area hospitals, both of whom required as a condition for eligibility membership in the County Medical Society. The Supreme Court rejected the Society's argument that as a private voluntary organization it was free to prescribe its own rules for membership. The court held that Dr. Falcone had a judicially enforceable right of admission to membership in the Society. After noting that the Society had a virtual monopoly power over the use of local hospital facilities through the exercise of which it could preclude plaintiff from successfully continuing his practice and could interfere with his patients' freedom of choice of physicians, Justice Jacobs stated:
Public policy strongly dictates that this power should not be unbridled but should be viewed judicially as a fiduciary power to be exercised in reasonable and lawful manner for the advancement of the interests of the medical profession and the public generally * * * [at 597]
The result in Greisman v. Newcomb Hospital, 40 N.J. 389 (1963), was based on a logical and necessary extension of the principles laid down in Falcone. In Greisman the issue was whether a private hospital could deny staff privileges to an osteopathic physician solely because he was not a graduate of a medical school approved by the A.M.A. and a member of the County Medical Society. The thrust of the court's opinion was that the discretionary powers of private hospital associations to control staff admission were "imbedded in public aspects" and must be viewed "as fiduciary powers to be exercised reasonably and for the public good." 40 N.J. at 402. In upholding the right of the courts to review the exercise of those powers the court stated:
Hospital officials are properly vested with large measures of managing discretion and to the extent that they exert their efforts toward the elevation of hospital standards and higher medical care, they will receive broad judicial support. But they must never lose sight *405 of the fact that the hospitals are operated not for private ends but for the benefit of the public, and that their existence is for the purpose of faithfully furnishing facilities to the members of the medical profession in aid of their service to the public. They must recognize that their powers, particularly those relating to the selection of staff members, are powers in trust which are always to be dealt with as such. While reasonable and constructive exercises of judgment should be honored, courts would indeed be remiss if they declined to intervene where, as here, the powers were invoked at the threshold to preclude an application for staff membership, not because of any lack of individual merit, but for a reason unrelated to sound hospital standards and not in furtherance of the common good. [at 403-404]
The court in Greisman did not have occasion to consider the validity of a hospital policy closing all staff appointments. That issue was presented in Davis v. Morristown Memorial Hospital, 106 N.J. Super. 33 (Ch. Div. 1969). In Davis two obstetricians were denied staff appointments by the Morristown Memorial Hospital solely on the basis of a moratorium policy similar, but not identical, to the moratorium adopted at PVH. There, as here, the sole justification for the hospital's policy was an excessive occupancy rate of available beds in the maternity unit. Judge Waugh, following the guidelines laid down in Greisman, concluded on the evidence before him that the action of the trustees was reasonably related to the maintenance of sound hospital standards and was neither arbitrary nor capricious. At the time of the decision the moratorium had been in effect for slightly more than a year, and according to the testimony of the hospital administrator, he intended to recommend its termination as soon as possible. Judge Waugh cautioned that
* * * when more obstetrical beds become available, or the percentage of occupancy is reduced to manageable proportions, or there are staff vacancies for any reason, that failure to admit physicians on the qualified list in order would steer the hospital into a collision course with the court. [at 53-54]
Only recently the Supreme Court had occasion to address itself to this issue in a different factual setting. In Guerrero v. Burlington Cty. Memorial Hosp., 70 N.J. 344 *406 (1976), two surgeons sought admission to the staff of the Burlington County Memorial Hospital for the purpose of practicing general surgery at a small satellite hospital designed to provide residents of the Long Beach Island area with a facility to treat urgent and emergency cases. Plaintiffs' applications were denied because the facility was already operating at near capacity and the admission of additional surgeons to its staff would increase the number of surgical cases performed there, which the board of trustees deemed not to be in the best interests of the community. In sustaining the action of the board the majority opinion concluded:
* * * At the outset, we readily acknowledge that the exercise of discretion by a hospital Board of Trustees is a very delicate process, particularly when the Board is called upon to determine whether staff privileges should be granted to an applying physician or surgeon. It is readily apparent that staff privileges for a member of the medical profession are essential to a viable medical practice. This is especially true as to surgeons. Unlike other types of physicians, surgeons must have access to a hospital operating room or they are precluded from practicing the specialty for which they have been trained.
Counterbalancing the needs of the physician, however, are those of the hospital. It has a primary interest in maintaining the quality of patient care it affords to those in need. It is sometimes the difficult task of those who administer hospitals to weigh the relative merits of these two vital and sometimes competing considerations. At times the wisdom of the determination may be challenged. On such occasions a reviewing court should confine its effort to determining whether the decision made by the hospital is supported by substantial credible evidence and is neither arbitrary nor capricious. When a decision fulfills these requirements, a reviewing court should refrain from substituting its own judgment for that of the hospital authorities.

* * * * * * * *
We have thoroughly reviewed the record in the case at bar and cannot conclude, as did the trial court and Appellate Division, that the Trustees' decision to deny staff privileges to plaintiffs was arbitrary and not reasonably in furtherance of the goals of a satellite hospital. To the contrary, the decision was motivated by the Trustees' unwillingness to permit the quality of patient care at SOCH to deteriorate  an occurrence they deemed inevitable if the facility were over-taxed by additional surgical cases. [at 355-356, 358]
*407 While holding that the record before it justified the action of the board, the court also cautioned that however broadly their discretionary powers may be viewed, those who administer hospital facilities are not privileged to discriminate against or treat new applicants unfairly, where the ultimate consequence of the policy serves only to foster the economic interests of existing staff members. And while the court cited Davis, supra, with apparent approval, the holding in Guerrero may have a more limited reach, as indicated by the following caveat:
Nothing we have said should be in any way construed as suggesting that hospitals may routinely deny staff privileges to doctors moving into an area. Any denial of such privileges, if motivated by a desire to exclude newcomers in order to maintain the status quo of the staff, would not be judicially tolerated. Implicit in our opinion in Falcone v. Middlesex County Medical Society, 34 N.J. 582, 597 (1961) is the belief that the power to exclude must be reasonably and lawfully exercised in furtherance of the interests of both the public and the medical profession. A denial predicated upon exclusionary policies fostering only the well-being of those staff members who are already admitted would clearly be in derogation of the spirit of Falcone. Where, however, as here, a facility is designed to accommodate a very limited number of patients and is intended primarily to afford treatment of urgent and emergent cases, a showing that an augmented surgical staff will engender additional surgery to the detriment of the facility provides a thoroughly rational basis for the Trustees' exercise of discretion in denying surgical privileges. [at 358 emphasis supplied.]
Apart from the limitations on this type of discretionary action evolved by our own courts, we must also be mindful of the fact that where a hospital facility has been the recipient of public funds or benefits under the Hill-Burton Act, supra, the federal constitutional mandates of due process and equal protection must be strictly observed.[5] *408 See Sosa v. Bd. of Mgrs. of Val Verde Mem. Hosp., 437 F.2d 173 (5 Cir.1971); Sams v. Ohio Valley Gen. Hosp. Ass'n, 413 F.2d 826 (4 Cir.1969); Citta v. Delaware Valley Hosp., 313 F. Supp. 301 (E.D. Pa. 1970); cf. Doe v. Bridgeton Hospital, 71 N.J. 478 (1976). Whether the standards of procedural and substantive fairness and nondiscriminatory treatment required by the 14th Amendment differ from those pronounced by our own courts may be debatable; it is sufficient to note for present purposes that issues of constitutional dimensions are present and some rational nexus must exist to support the denial of staff privileges to otherwise qualified physicians. Sams, supra at 829; cf. Foster v. Mobile County Hosp. Bd., 398 F.2d 227 (5 Cir.1968). In Sams three physicians were denied staff privileges at two hospitals because each limited its staff to physicians having an office in Ohio County, West Virginia. Plaintiffs' offices were located across the river in Belmont County, Ohio, but their practice included residents of Ohio County. The court held (at 829) the eligibility requirement to constitute a "classification without rationality" and to be constitutionally "frivolous".
From this brief perspective of the decisional law we can then weigh the merits of plaintiffs' position here to determine whether there is any substantial credible evidence to support PVH's moratorium, or whether it is arbitrary or capricious. Guerrero, supra, 70 N.J. at 356. It may be observed that the relationship between the governing body of a hospital facility and its medical staff is both sensitive and symbiotic. The governing body must see to it that the facility is adequately staffed by physicians who are qualified to perform the full range of patient services offered by the institution and necessary to meet the needs of the community. Apart from its physical plant and equipment, no hospital can be any better than the competency, dedication and loyalty of its medical staff. At the same time, as has frequently been noted, no physician can practice his profession today without having available to him the services *409 and facilities of a hospital. See Guerrero v. Burlington Cty. Memorial Hosp., supra at 355; Greisman v. Newcomb Hospital, supra, 40 N.J. at 402; Wyatt v. Tahoe Forest Hosp. Dist., 174 Cal. App.2d 709, 345 P.2d 93, 97 (D. Ct. App. 1959). The governing body and the medical staff are obviously dependent upon each other, and from this symbiosis the common goal of serving the health needs of the community at large will be furthered.
PVH commenced its operation less than 20 years ago as a relatively small general hospital. At the outset it had to assemble a medical staff from among physicians in the area, most of whom were already affiliated with other hospital institutions. Its success in doing so is attested to by the fact that almost from its inception the hospital experienced a high bed occupancy ratio. Over the years it expanded its facilities and services and continued to attract and accept new physicians to its staff to accommodate the needs of its patients. By 1970, however, the medical-surgical bed occupancy rate was substantially in excess of that recommended by the American Hospital Association. The board of Trustees acting at the behest of the medical staff, but after its own investigation of the facts, adopted the moratorium in response to that specific problem. At the same time it recognized the need to augment its own staff and an obligation to furnish admitting privileges to new or otherwise unaffiliated physicians. Hence, the moratorium was adopted with exceptions designed to accomplish both purposes.
I have no doubt, and indeed I so find, that the board of trustees acted in good faith in adopting the moratorium in the first instance, and certainly the action which it took had at least a veneer of reasonableness to commend it. But if we probe beneath the surface, it is evident that a moratorium on staff appointments cannot alleviate bed occupancy problems, particularly where, as here, the population of the service area is undergoing a significant increase. If an existing staff of physicians is already utilizing all of the hospital's beds, it *410 will inevitably continue to do so, all other factors being equal. The experience at PVH following the adoption of the moratorium demonstrates that closing staff appointments is not a workable solution to reduce a bed occupancy problem. Since 1970 the bed occupancy rate increased, and even after the addition of 40 beds in 1975 the bed occupancy rate continues to be nearly 100%.
This conclusion was confirmed by the testimony of Joseph Slavin, who was called as an expert witness by defendant. Slavin is the executive director of the Hospital & Health Planning Council of Metropolitan New Jersey, Inc., which is the official health system agency for Area II, comprising the counties of Essex, Morris, Sussex, Union and Warren. See N.J.S.A. 26:2H-3. He testified that he was unaware of any hospital in the region he supervises which had adopted a policy of closing staff appointments as a device to control bed occupancy. He, too, noted that the moratorium at PVH had no discernible impact on the bed occupancy rate there, and he expressed the opinion that closing staff appointments at any hospital because of a bed occupancy problem was inconsistent with regional health care planning on a state-wide basis, since certificates of need required for hospital expansion are determined on a regional basis.
It is relevant to note in the context of this testimony that when PVH made an application for a certificate of need to enlarge its facilities, one reason it cited was the existence of the moratorium and its adverse impact on physicians and the health needs of the residents in its service area. The implication was that if the expansion of PVH were permitted, PVH would rescind its moratorium. Having secured a certificate of need for its desired expansion, PVH thereby diminished the opportunity for expansion on the part of other hospitals in its region, and the continued exclusion of qualified physicians practicing within its service area from its staff directly affects their ability to satisfy the needs of their patients at hospitals where they are affiliated.
*411 Assuming the moratorium was a reasonable exercise of the board's discretion when it was originally adopted, the question is whether the board can continue it in effect after the hindsight of history has shown it to be an irrational means to accomplish an otherwise acceptable objective. Experience has shown that in terms of the quality of patient care, 100% occupancy is 100%, regardless of the number of physicians on the staff, and the only significant effect of continuing the closure of staff appointments is to confine control of the institution's beds to its existing medical staff and to enhance their economic interests at the expense of other qualified physicians whose patients are thereby excluded.[6] Such a consequence is precisely what our Supreme Court said in Guerrero would not be "judicially tolerated." If there were any credible evidence that the continuation of the moratorium contributed or was related to the quality of patient care at PVH, this court would be both obliged and eager to sustain it. However, nothing has been shown in the record before me to indicate that this has been the case, nor has there been a showing that the high bed occupancy rate at PVH has adversely affected patient care at the institution; the only factor ever suggested  pressure on the staff to discharge patients too soon  was acknowledged to be unprovable and is simply not borne out by the statistical evidence.
It must also be observed that the moratorium at PVH has been honored almost as much in its breach as its observance. Since 1970, 67 physicians have been granted staff privileges of one kind or another under its exceptions. While in most instances the use of the exceptions to admit new *412 staff members was in accordance with the spirit, if not the letter, of the moratorium, on several occasions staff privileges would appear to have been granted solely for the purpose of accommodating existing members of the staff in violation of the moratorium policy. This practice was made possible under the "limited sub-specialty" exception. All of PVH's witnesses acknowledged that there is no standard by which anyone can determine what constitutes a medical "sub-specialty," and that the term is not susceptible of definition. Not only can reasonable men differ as to its abstract meaning, but they in fact did so in dealing with Dr. Walsky's application here. The establishment of an undefinable classification for the granting or denial of important economic benefits by those entrusted with fiduciary powers affecting the public's interest clearly violates the public policy of this State and is constitutionally impermissible. Weiner v. Stratford, 15 N.J. 295, 298-300 (1954); Raritan Tp. v. Hubb Motors, Inc., 26 N.J. Super. 409, 410-11 (App. Div. 1953); cf. Prog. Action Coord. Team v. Orange, 111 N.J. Super. 245, 251-52 (Ch. Div. 1970); Carrington v. Rash, 380 U.S. 89, 92-93, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965); Lanzetta v. New Jersey, 306 U.S. 451, 453-455, 59 S.Ct. 618, 83 L.Ed. 888 (1939); J.D. Land Corp. v. Allen, 114 N.J. Super. 503, 512 (App. Div. 1971); see Moyant v. Paramus, 30 N.J. 528, 553 (1959); 9 McQuillin, Municipal Corporations (3 ed. 1964), § 26.64.
Further, the moratorium invidiously discriminates against newly admitted members of the staff of PVH who are required to agree not to seek staff privileges elsewhere if admitted to PVH. Those admitted to the staff prior to the moratorium are not subject to the same restriction, but are free to retain existing affiliations at other hospitals or to seek new ones if the beds at PVH are inadequate to meet the needs of their patients. The proffered justification for this disparity in treatment was that such a curtailment on the old staff would only increase the demand for bed space at PVH. This is unquestionably true, but the logic of the *413 argument applies in equal measure to new staff members if they are required to look only to PVH to satisfy their patients' needs for hospitalization. One is forced to conclude that the reason for this restriction on newly admitted physicians is not related to problems of bed occupancy, but rather is designed to discourage new applications for staff privileges. In any event, this form of discriminatory treatment, wholly unrelated to patient care or the needs of the institution, is clearly violative of the Equal Protection Clause, which requires that all persons in like circumstances be treated alike, both as to privileges conferred and burdens imposed. See Rinaldi v. Yeager, 384 U.S. 305, 308-310, 86 S.Ct. 1497, 16 L.Ed.2d 577 (1966), Baxstrom v. Herold, 383 U.S. 107, 111, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966); McLaughlin v. Florida, 379 U.S. 184, 190-192, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964); Sams v. Ohio Valley Gen. Hosp. Ass'n, 413 F.2d 826, 828-29 (4 Cir.1969); Moyant v. Paramus, 30 N.J. 528, 550 (1959); DeRose v. Byrne, 135 N.J. Super. 273, 288 (Ch. Div. 1975).
The primary concern of a hospital, whether it be public or private, is to maintain the quality of patient care it provides to those in need. Guerrero, supra, 70 N.J. at 355. To iterate what has already been said, I find no credible evidence in the record before me that the continuation of the moratorium could in any way contribute toward the accomplishment of that objective. Further, the consistent practice pursued by PVH of granting staff privileges under the moratorium's exceptions violates constitutional requirements of equal treatment and fair play to which defendant is obligated to adhere. The denial of staff privileges to qualified physicians practicing within the hospital's service area deprives their patients of the benefit of their services and significantly interferes with the excluded physicians' opportunity to practice their profession on an equal basis with those who are accorded staff privileges. For these reasons the court finds that the moratorium resolution in effect *414 at the present time represents an arbitrary and capricious exercise of discretion on the part of the board of trustees, and judgment will be entered directing defendant to admit Dr. Walsky to its staff and to process the application of Dr. DiGiovanni without regard to the restrictions contained in the moratorium.
NOTES
[1] In addition to PVH, Bergen County has the following hospitals: Englewood (397), Fairlawn (69), Hackensack (353), Holy Name (238), Riverdell (71), Saddle Brook General (162), South Bergen (40), Valley (273) and Bergen Pines (200). The figures in parenthesis represent the number of medical-surgical beds in each facility. Bergen Pines is a county public hospital; all the others are private. According to one witness, both Hackensack and Englewood Hospitals are closed to new staff appointments. Based on affidavits presented in another case pending before this court, Valley Hospital has also limited new staff appointments.
[2] The approval granted in 1972 also authorized the construction of a "shelled-in area" for an additional 40 beds, for which a further certificate of need will be required. According to the draft report of the New Jersey Department of Health for the fiscal year 1976-77, Bergen County has an excess of 100 medical-surgical beds and it is problematic whether PVH could obtain a certificate of need to add any additional beds in the near future.
[3] In his report to the board Verrastro noted that this "thesis" could not be proved. Indeed, based upon the statistical analysis compiled by the Health Care Facilities Council for 1975, the average length of stay for patients occupying medical-surgical beds in PVH is higher than most other hospitals in Bergen County and slightly exceeds the average for all hospitals in the State in its category.
[4] Throughout these proceedings PVH has conceded Dr. Walsky's qualifications for appointment to its staff, and the denial of his application was based solely on the fact that he did not meet the requirements of the moratorium.
[5] The record here is barren of any specifies as to the amount of federal funds received by PVH. However, the witnesses for PVH acknowledged that it had received Hill-Burton monies or interest subsidies in an undisclosed amount in connection with the construction or expansion of hospital facilities.
[6] It is worthy of mention that the then chairman of the board of Trustees testified he had the impression that the medical staff was pressing for the adoption of the moratorium in 1970 for its own economic benefit. A member of the medical staff at PVH who testified at the trial acknowledged that his practice, as well as that of most doctors on the staff, had increased since the adoption of the moratorium.